## HUMBIRD *v.* AVERY.

### CERTIFICATE FROM AND ORDER TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 7.    Argued October 23, 26. 1903.—Decided December 12, 1904.

The act of Congress of July 1, 1898, 30 Stat. 597, 620, c. 546, relating to the land grant to the Northern Pacific Railroad Company, construed: *Held,*

1. That the act embraces land patented as well as unpatented, to which the right of the grantee or its lawful successor is claimed to have attached by definite location or selection, and which has been purchased directly from the United States or settled upon or claimed in good faith by any qualified settler under color of title or claim of right under any law of the United States or any ruling of the Interior Department.

2. The words in that act providing that the railroad grantee or its successor in interest "shall not be bound to relinquish lands sold or contracted by it or lands it uses or needs for railroad purposes, or lands valuable for stone, iron, or coal,"— do not apply to any lands sold or contracted by the railroad grantee or its successor in interest after the acceptance of the provisions of the act by the Northern Pacific Railway Company; no sale or contracting away of any of the lands embraced by

the act, and in dispute, after the acceptance of the grant could withdraw such lands from the operation of the act.

3. Whatever vested rights were acquired by the railroad company in virtue of the definite location of its route, as to any lands in dispute and embraced by the act of 1898, became subject to the power conferred upon the Land Department by that act.

4. The general doctrine reaffirmed that the courts will not interfere with the discharge of their duties by the officers of the Land Department by mandamus or injunction in reference to any lands, so long as the title thereto remains in the United States.

5. The selection of lands in indemnity limits, after definite location, to supply deficiencies in place or granted limits, does not invest any title in the railroad grantee to such lands until the selections are approved by the Secretary of the Interior. The railroad grantee does not become entitled, by reason of such unapproved selections, to ask a court of equity to intervene as between it or its successors in interest and individual claimants, so as to have the court declare that the latter could not, by any entry or purchase, acquire an interest in the lands so selected after the acceptance of the railroad's map of definite location.

THIS case was brought before us upon questions certified by the Circuit Court of Appeals. Subsequently, the United States was allowed to intervene upon the general ground that the case involved important questions affecting the administration of the public land laws, including the grant to the Northern Pacific Railroad Company then in process of adjustment. And, on motion of the Government, the plaintiffs and defendants concurring, the whole record was ordered to be sent up for our consideration.

The case involves the title to numerous tracts of land situated on the line of the Northern Pacific Railway between Duluth and Ashland. The lands are described in an exhibit attached to the bill.

The plaintiffs Humbird and Weyerhaeuser sue as grantees of the Northern Pacific Railway Company, a Wisconsin corporation, which, it is claimed, succeeded in respect of the lands in dispute to all the rights, interests and ownership of the Northern Pacific Railroad Company created by the act of Congress of July 2, 1864, 13 Stat. 365, c. 217. They allege that the claims of the defendants constitute clouds upon their title.

The defendants assert title under the land laws as settlers and purchasers from the United States or grantees of such settlers and purchasers. But the bill alleges that the lands here in dispute are part of the grant to the Northern Pacific Railroad Company and that the Land Department wrongfully and unlawfully permitted the entries under which the defendants severally claim. The Circuit Court dismissed the bill, but without prejudice, except as to all lands here involved for which patents had been issued. 110 Fed. Rep. 465.

It seems both appropriate and necessary that the facts be fully stated. That statement we now proceed to make, premising that the present controversy had its origin, as will be presently shown, in conflicting orders or rulings in the Land Department as to what was the eastern terminus of the Northern Pacific Railroad.

By the above act of July 2, 1864, c. 217, Congress made a grant of lands to the Northern Pacific Railroad Company in aid of the construction of a railroad and telegraph line from some point on Lake Superior in Minnesota or Wisconsin to some point on Puget Sound with a branch via Columbia River to a point at or near Portland. The act established indemnity limits not more than ten miles beyond the limits of the alternate sections granted. 13 Stat. 365.

By a Joint Resolution, approved May 31, 1870, second indemnity limits were established within ten miles on each side of the road, beyond the limits prescribed in the company's charter. 16 Stat. 378, Res. 67. The effect of this resolution was to allow the company, under the direction of the Secretary of the Interior, to go into second indemnity limits in order to supply any deficiency in lands on its main line or branch.

On the third day of July, 1882, the company transmitted to the Secretary of the Interior a map of definite location covering the proposed line from Thompson Junction on the St. Paul and Duluth Railroad near Duluth, Minnesota, to Ashland in Wisconsin. That map was duly approved by the

Secretary of the Interior, and the lands embraced by it were withdrawn from sale or entry.

By resolution of the Board of Directors of the company, adopted August 28, 1884, Ashland was declared to be the eastern terminus of the road; and that resolution was accepted by the Secretary on December 3, 1884, as establishing such terminus.

The part of the railroad delineated on the map of definite location was constructed and was duly accepted; and in conformity with the direction of the Secretary the company, the Circuit Court states, filed lists of selections of lands, some in the first and others in the second indemnity limits, in lieu of lands lost to it in its place limits—such lists *including all the lands in controversy in this suit*. But the bill avers that no final action has ever been taken by the Land Department upon such lists; and they have not yet been approved by the Department.

Subsequently, on August 12, 1896, the Secretary of the Interior ruled that Duluth, not Ashland, was the eastern terminus of the railroad, and therefore that the land grant of 1864 did not embrace any lands between Duluth and Ashland. The company's lists of selections were thereupon canceled by order of the Secretary, and the lands covered by them were thereafter treated by the Department as unappropriated public lands and were opened for sale and entry.

This appears from an official communication addressed by the Commissioner of the General Land Office, with the approval of the Secretary of the Interior, to the Register and Receiver at Duluth. In that communication the Commissioner said: "On August 27th, 1896, the Secretary of the Interior rendered a decision wherein he held that the initial point on Lake Superior or the eastern terminus of the grant to the Northern Pacific Railroad Company was at Duluth, Minnesota, and on December 24th, 1896, he approved a diagram prepared by this office showing the eastern terminal of the grant. On January 23d, 1897, a copy of so much of said

diagram as related to or affected lands within your district was transmitted to you for the use and guidance of your office. The decision of the Secretary aforesaid had the effect of restoring to the public domain all lands lying east of said termi-. .ial which had theretofore been withdrawn on account of the grant to said railroad company. Therefore, to the end that all persons interested may have an opportunity to present any claims they may have to any of these lands, you will cause to be published for the period of thirty days, in some newspaper of general circulation in their vicinity, a notice referring to said Secretary's decision which in effect declared that all lands previously withdrawn on account of the grant to the Northern Pacific Railroad Company and lying east of the terminal established at Duluth are restored to the public domain and are subject to disposal at your office."

Under the above ruling of the Secretary as to the eastern terminus, the defendants were allowed to make entries and purchases on the line of the railroad between Duluth and Ashland, despite the company's map of definite location and the lists of selections filed by it with the Secretary. In reference to the action of the Interior Department, the Circuit Court said: "By reason of the erroneous ruling of the Secretary of the Interior as to the location of the eastern terminus of said railroad, and his revocation of his prior approval of lawful selections by the railroad company of indemnity lands, and permitting sales and entries of such selected lands as unappropriated, he had introduced confusion and conflict in respect to the right to such lands, which was beginning to be litigated in the courts; . . . The fact that patents had issued in a few instances would not end such disputes as to the lands so patented, as courts would adjudge the patentee in any case to hold the title in trust for the other party, wherever the other party had clearly the right to the land." 110 Fed. Rep. 465, 469.

Such was the situation when Congress incorporated into the body of the Sundry Civil Appropriation act of July 1, 1898,

30 Stat. 597, 620, c. 546, subdivision, "Surveying the Public Lands," certain provisions relating to the Northern Pacific land grant. As these provisions disclose a scheme or plan for the settlement of the disputes arising out of the conflicting rulings in the Land Department in reference to the eastern terminus of the railroad, and its action in reference to the public lands between Duluth and Ashland, they should all be examined in order to ascertain the intention of Congress. They are therefore here given in full.

By that act—dividing it, for convenience, into paragraphs —it was provided:

1. "That where, prior to January first, eighteen hundred and ninety-eight, the whole or any part of an odd-numbered section, in either the granted or the indemnity limits of the land grant to the Northern Pacific Railroad Company, to which the right of the grantee or its lawful successor is claimed to have attached by definite location or selection, has been purchased directly from the United States or settled upon or claimed in good faith by any qualified settler under color of title or claim of right under any law of the United States or any ruling of the Interior Department, and where purchaser, settler, or claimant refuses to transfer his entry as hereinafter provided, the railroad grantee or its successor in interest, upon a proper relinquishment thereof, shall be entitled to select in lieu of the land relinquished an equal quantity of public lands, surveyed or unsurveyed, not mineral or reserved, and not valuable for stone, iron, or coal, and free from valid adverse claim or not occupied by settlers at the time of such selection, situated within any State or Territory into which such railroad grant extends, and patents shall issue for the land so selected as though it had been originally granted; but all selections of unsurveyed lands shall be of odd-numbered sections, to be identified by the survey when made, and patent therefor shall issue to and in the name of the corporation surrendering the lands before mentioned, and such patents shall not issue until after the survey:

2. "*Provided, however,* That the Secretary of the Interior shall from time to time ascertain and, as soon as conveniently may be done, cause to be prepared and delivered to the said railroad grantee or its successor in interest a list or lists of the several tracts which have been purchased or settled upon or occupied as aforesaid, and are now claimed by said purchasers or occupants, their heirs or assigns, according to the smallest Government subdivision. And all right, title, and interest of the said railroad grantee or its successor in interest in and to any of such tracts, which the said railroad grantee or its successor in interest may relinquish hereunder shall revert to the United States, and such tracts shall be treated, under the laws thereof, in the same manner as if no rights thereto had ever vested in the said railroad grantee, and all qualified persons who have occupied and may be on said lands as herein provided, or who have purchased said lands in good faith as aforesaid, their heirs and assigns, shall be permitted to prove their titles to said lands according to law, as if said grant had never been made; and upon such relinquishment said Northern Pacific Railroad Company or its lawful successor in interest may proceed to select, in the manner hereinbefore provided, lands in lieu of those relinquished, and patents shall issue therefor:

3. "*Provided further,* That the railroad grantee or its successor in interest shall accept the said list or lists so to be made by the Secretary of the Interior as conclusive with respect to the particular lands to be relinquished by it, but it shall not be bound to relinquish lands sold or contracted by it or lands which it uses or needs for railroad purposes, or lands valuable for stone, iron, or coal:

4. "*And provided further,* That whenever any qualified settler shall in good faith make settlement in pursuance of existing law upon any odd-numbered sections of unsurveyed public lands within the said railroad grant to which the right of such railroad grantee or its successor in interest has attached, then upon proof thereof satisfactory to the Secretary of the Interior,

and a due relinquishment of the prior railroad right, other lands may be selected in lieu thereof by said railroad grantee or its successor in interest, as hereinbefore provided, and patents shall issue therefor:

5. "*And provided further*, That nothing herein contained shall be construed as intended or having the effect to recognize the Northern Pacific Railway Company as the lawful successor of the Northern Pacific Railroad Company in the ownership of the lands granted by the United States to the Northern Pacific Railroad Company, under and by virtue of foreclosure proceedings against said Northern Pacific Railroad Company in the courts of the United States, but the legal question whether the said Northern Pacific Railway Company is such lawful successor of the said Northern Pacific Railroad Company, should the question be raised, shall be determined wholly without reference to the provisions of this act, and nothing in this act shall be construed as enlarging the quantity of land which the said Northern Pacific Railroad Company is entitled to under laws heretofore enacted:

6. "*And provided further*, That all qualified settlers, their heirs or assigns, who, prior to January first, eighteen hundred and ninety-eight, purchased or settled upon or claimed in good faith, under color of title or claim of right under any law of the United States or any ruling of the Interior Department, any part of an odd-numbered section in either the granted or indemnity limits of the land grant to the Northern Pacific Railroad Company to which the right of such grantee or its lawful successor is claimed to have attached by definite location or selection, may in lieu thereof transfer their claims to an equal quantity of public lands surveyed or unsurveyed, not mineral or reserved, and not valuable for stone, iron, or coal, and free from valid adverse claim, or not occupied by a settler at the time of such entry, situated in any State or Territory into which such railroad grant extends, and make proof therefor as in other cases provided; and in making such proof, credit shall be given for the period of their bona fide residence and

amount of their improvements upon their respective claims in the said granted or indemnity limits of the land grant to the said Northern Pacific Railroad Company the same as if made upon the tract to which the transfer is made; and before the Secretary of the Interior shall cause to be prepared and delivered to said railroad grantee or its successor in interest any list or lists of the several tracts which have been purchased or settled upon or occupied as hereinbefore provided, he shall notify the purchaser, settler, or claimant, his heirs or assigns, claiming against said railroad company, of his right to transfer his entry or claim, as herein provided, and shall give him or them option to take lieu lands for those claimed by him or them or hold his claim and allow the said railroad company to do so under the terms of this act." 30 Stat. 597; 620.

The provisions of that act were formally accepted in writing by the Northern Pacific Railway Company on the thirteenth of July, 1898, in writing, and such written acceptance was promptly transmitted by the company to the Secretary of the Interior.

In a case in the Supreme Court of Wisconsin, determined shortly before the act of 1898, it was held, contrary to the ruling of the Interior Department in 1896, that Ashland, and not Duluth, was the eastern terminus of the Northern Pacific Railway. *Northern Pacific Railway Co.* v. *Doherty*, 100 Wisconsin, 39. Upon writ of error to this court that judgment was affirmed. *Doherty* v. *Northern Pacific Railway Co.*, and *United States* v. *Northern Pacific Railroad Company*, 177 U. S. 421 and 435.

After the above decisions by this court—which were rendered April 16, 1900,—the Secretary of the Interior revoked the order canceling the company's above lists of selections, and reinstated them. Shortly before those cases were argued here, namely, on January 19, 1900,—and apparently to meet the contingency of a reversal by this court of the judgment of the Supreme Court of Wisconsin—the Northern Pacific Railway Company made conveyances with warranty to the

plaintiffs Humbird and Weyerhaeuser, of all the lands, aggregating more than 10,000 acres, the title to which is here in dispute. As appears from the record, these conveyances were made after the Land Department had issued regulations to facilitate the adjustment of claims under the act of July 1, 1898. It should be recalled here that the lands covered by those conveyances were placed on the above lists of selections filed by the railroad company, but those lists had not then nor have they since received the approval of the Secretary.

It is contended by the plaintiffs that the result of the above decisions in this court, adjudging the eastern terminus of the Northern Pacific Railroad to be at Ashland, Wisconsin, and not at Duluth, Minnesota, was that the odd-numbered alternate sections between Duluth and Ashland, on either side of the railroad, as definitely located, to the extent and within the limits prescribed, and not excluded from the grant of July 2, 1864, were to be deemed public lands, from which that grant could be supplied, and to which neither the defendants nor their grantors *after* the definite location of the road as shown by the company's accepted map of location could have acquired any valid title, by entry or settlement, or by purchase, except from the railroad grantee, and that the defense cannot be maintained without violating the rights that were *vested* in the company *in virtue of* such definite location.

The defendants, of course, combat this view of the rights of the parties, and insist that they are fully protected in their claims by the act of 1898, all the provisions of which, as we have seen, were accepted by the railroad company.

In the statement accompanying the certified questions it is set forth that prior to the passage of the act of July 1, 1898, the Secretary of the Interior had, pursuant to his original ruling as to the eastern terminus of the railroad, caused patents to be delivered to defendant settlers or their grantors for about 3,400 acres of the lands involved in this suit; that at the time of the passage of that act about 2,800 acres of the lands in question had been entered by defendant settlers or their

grantors prior to January 1, 1898, but no patents therefor had been issued; that after January 1, 1898, the settlers or their grantors were permitted to enter about 5,000 acres of the lands here in controversy. The situation is thus described in the statement sent up by the Circuit Court of Appeals: Of the lands claimed by the plaintiffs as successors in interest of the Northern Pacific Railroad Company about 3,400 acres thereof were held by the appellees under patents issued by the Government prior to July 1, 1898; for the residue of the lands the settlers held final receipts and final certificates, such final receipts and final certificates, as respects about 5,000 acres, being for tracts entered subsequent to January 1, 1898. In reference to the lands for which final receipts and certificates have been issued nothing, so far as appears, remains to be done by the Land Department except the issuing of patents.

The relief sought is a decree declaring, among other things, that the lands described in the exhibit attached to the bill and all the timber standing or lying thereon belong to the plaintiffs; that the entries, locations, final certificates, land office receipts and patents, under which the several defendants claim, be adjudged to be void and removed as clouds from the titles of the plaintiffs, and the defendants severally enjoined from asserting any title by virtue thereof; and that such of the defendants as hold patents may be declared to hold as trustees for the plaintiffs in respect of any title conveyed by such patents, or any timber, cut or uncut, on such lands.

The questions propounded to this court by the Circuit Court of Appeals are these:

"Is the act of July 1st, 1898, applicable to the determination of the rights of the parties to the 3,400 acres of land which were patented to the appellees or their predecessors in interest prior to the adoption of the act of July 1st, 1898?

"Has the Circuit Court of the United States for the District of Minnesota, or any court, jurisdiction as respects the lands in controversy entered subsequent to January 1st, 1898, and for which the settlers hold final receipts or certificates,

to adjudicate the rights of the parties to this action in respect
to said lands in advance of the issuance of patents therefor
by the executive branch of the Government, or should the
courts decline jurisdiction until the Government has divested
itself of the legal title to the lands by the issuance and delivery
of patents?"

*Mr. William W. Billson* and *Mr. Charles W. Bunn*, with
whom *Mr. Chester A. Congdon*, *Mr. H. Oldenburg* and *Mr.
James B. Kerr* were on the brief, for appellants:

After these lands had been regularly selected by the rail-
road company, under the direction of the Secretary of the
Interior, in lieu of unsatisfied and appropriate losses from
place limits, they were wrongfully and finally awarded by the
Secretary of the Interior to subsequent entrymen, through
error of law as to the eastern terminus of the road; equity will,
therefore, enforce the superior right of the railroad company
or its grantees. This would be so even though the Secretary's
approval of the selections had been expressly required by the
terms of the act, and had been withheld or refused. *St. Paul
R. R. Co.* v. *Winona & St. P. R. R. Co.*, 112 U. S. 720; *Sage* v.
*Swenson*, 64 Minnesota, 517; *So. Pac. R. R. Co.* v. *Wiggs*, 43
Fed. Rep. 333, 338; *McHenry* v. *Nygaard*, 72 Minnesota, 2, 12;
*Groeck* v. *So. Pac. R. R. Co.*, 102 Fed. Rep. 632.

Under these circumstances, the courts will decide any ques-
tions of fact which, by its error of law, the Department of the
Interior was led to ignore. *Cunningham* v. *Ashley*, 14 How.
377; *Lytle* v. *Arkansas*, 9 How. 328; *Ard* v. *Brandon*, 156 U. S.
537; *Duluth & Iron Range R. R. Co.* v. *Roy*, 173 U. S. 587;
*Wright* v. *Roseberry*, 121 U. S. 498; *Bisson* v. *Curry*, 35 Iowa,
72.

No controversies are pending in the department even as
to such of the lands as are unpatented. Final certificates
have been issued in all cases to the entrymen, and stand as the
unrevoked, though legally erroneous, final judgment of the
department in favor of their claims. Under such circum-

stances, equitable relief is not prematurely sought. *Moore* v. *Robins*, 96 U. S. 530; *Berthold* v. *McDonald*, 22 How. 334; *Orchard* v. *Alexander*, 157 U. S. 372; *S. C.*, 26 Pac. Rep. 196; *Pierce* v. *Frace*, 26 Pac. Rep. 192.

In the recent cases of *Bockfinger* v. *Foster*, 190 U. S. 116, and *Cosmos Co.* v. *Gray Eagle Co.*, 190 U. S. 301, this view of the law appears to have been tacitly admitted, although under the circumstances existing in those cases relief was denied. With respect to the unpatented lands, the complainants are in any event entitled to relief by way of injunction. *La Chapelle* v. *Bubb*, 69 Fed. Rep. 481.

Threats of trespass are unnecessary. A reasonable probability of trespass or a well grounded apprehension of it may arise from the nature of the situation. *Osborn* v. *U. S. Bank*, 9 Wheat. 738, 840.

The withdrawal for the benefit of the Lake Superior & Mississippi Railroad Company on location of its general route, of lands not falling within its ultimate place limits, did not operate to exempt such lands from the subsequent grant to the Northern Pacific Company. *Nor. Pac. R. R. Co.* v. *Sanders*, 166 U. S. 620; *Menotti* v. *Dillon*, 167 U. S. 703; *United States* v. *Oregon &c. R. R. Co.*, 176 U. S. 28; *Kansas Pac. R. R. Co.* v. *Atchison &c. Co.*, 112 U. S. 414.

Every case in which a withdrawal for the benefit of a railway company has been held to segregate the land as against subsequent legislative grants has been the case of a withdrawal on definite location. *Spencer* v. *McDougal*, 159 U. S. 62, distinguished.

In all cases holding that only those lands are a part of the public domain within the meaning of land grant acts, which are open to entry under the general land laws, the withdrawals had been made for the protection of a right which, if all the facts could be known, might appear to have become actually vested. Withdrawals of that character it is presumptively the intention of Congress to respect in making subsequent grants. This court has held (see cases cited *supra*) that with-

drawals on definite location are to be treated as withdrawals of that class, while withdrawals on location of general route are not to be so treated, but are to be regarded as made merely for the accommodation of the company, in order that its rights may have opportunity to attach to the withdrawn lands, subject however to such legislative dispositions as in the interim may be made of them.

These lands having been sold by the railway company prior to their identification by the lists of the Secretary of the Interior for relinquishment by the railroad company under the provisions of the Sundry Civil Act of July 1, 1898, are, by the express terms of the second proviso of that act, exempted from the company's obligation to relinquish. Interpreted in general terms, the case presented by that proviso is that of a statute which makes the legality or force of a transaction (in this instance the service of the Secretary's lists), dependent in part upon the existence of a particular condition (in this instance, whether lands are sold or unsold), without expressly declaring whether it is at the time of the transaction or at the date of the statute, or at the date of its acceptance, or at some other time that the prescribed condition must exist. This is the natural and grammatical and necessary construction of the law if the clause relative to sold lands is to have any practical operation whatever. No one could have conceived it to be necessary to expressly except from the company's obligation to relinquish lands which it had already sold or contracted prior to the act of 1898. The sole object of the clause relative to sold lands was to enable the company to continue its business, and the handling of its grant in the ordinary course, during the many years which would be likely to elapse before the adjustments contemplated by the act of 1898 should have been fully accomplished. Such also is the construction suggested by the analogy of the acts *in pari materia* to this. Act of June 22, 1874, 18 Stat. 194; Act of October 1, 1890, 26 Stat. 674.

The act of 1898 is inapplicable to land patented before its

passage, and is inapplicable to lands purchased by others than actual settlers. If applicable to such purchases as those under the timber and stone land act, it is only in those instances in which the purchase was made or consummated by payment of the money prior to January 1, 1898.

*Mr. Assistant Attorney General Campbell* and *Mr. A. C. Campbell*, Assistant Attorney, with whom *Mr. F. W. Clements*, Assistant Attorney, was on the brief, for the United States, intervenor:

In view of the provision in § 3 of the act of July 2, 1864, that "other lands shall be selected by said company . . . under the direction of the Secretary of the Interior," and of the provision in the joint resolution of May 31, 1870, that "said company shall be entitled, under the directions of the Secretary of the Interior, to receive so many sections," etc., the Land Department has uniformly held that until an indemnity selection made by the Northern Pacific Railroad Company is approved by the Secretary of the Interior the title to the lands covered thereby remains in the Government, and that no right vests in the company until such approval is given. *Re Nor. Pac. R. R. Co.*, 2 L. D. 820; *Nor. Pac. R. R. Co.* v. *Miller*, 7 L. D. 100, 123; *Nor. Pac. R. R. Co.* v. *Walters*, 13 L. D. 230, 233; *Nor. Pac. R. R. Co.* v. *Blain*, 27 L. D. 361, 363; *Nor. Pac. R. R. Co.* v. *Fly*, 27 L. D. 464, 466; *Meister* v. *St. P., M. & M. R. Co.*, 14 L. D. 624; *Dunnigan* v. *N. P. R. R. Co.*, 27 L. D. 467. The first ruling in this respect was made in May, 1883, and has been adhered to ever since. It should not therefore be overthrown by the court, unless plainly erroneous. *Hewitt* v. *Schultz*, 180 U. S. 139, 156; *Hawley* v. *Diller*, 178 U. S. 476, 488. In passing upon other land grant acts containing similar provisions this court has upheld this ruling of the Land Department. *Ryan* v. *Railroad Company*, 99 U. S. 382; *Sioux City &c. R. R. Co.* v. *Chi., M. & St. P. Ry. Co.*, 117 U. S. 406; *Wis. Cent. R. R. Co.* v. *Price County*, 133 U. S. 496, 511; *United States* v. *M., K. & T. Ry. Co.*, 141 U. S.

358, 373; *So. Pac. R. R. Co.* v. *Bell*, 183 U. S; 675, 690; *Clark* v. *Herrington*, 186 U. S. 206.   The foregoing and the following decisions of this court, viz, *United States* v. *McDaniel*, 7 Pet. 1, 14, 15; *Williams* v. *United States*, 138 U. S. 514, 524; *Knight* v. *U. S. Land Assn.*, 142 U. S. 161, 177; *Catholic Bishop of Nesqually* v. *Gibbon*, 158 U. S. 155, 167; *Caha* v. *United States*, 152 U. S. 211, 222; *Kan. Pac. R. R. Co.* v. *Atchison &c. R. R. Co.*, 112 U. S. 414, 421; *Barney* v. *Winona &c. R. R. Co.*, 117 U. S. 228, 232; *New Orleans* v. *Paine*, 147 U. S. 261, 267; *Michigan Land &c. Co.* v. *Rust*, 168 U. S. 589, 592; *Nor. Pac. R. R. Co.* v. *Musser-Sauntry Co.*, 168 U. S. 604, 611; *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.*, 190 U. S. 301, 308; *Riverside Oil Co.* v. *Hitchcock*, 190 U. S. 316, 324, settle beyond controversy the following propositions:

1. Upon the Land Department is imposed the duty of administering the Northern Pacific Railroad land grant, and it is clothed with power and authority to prescribe rules and regulations to that end, which necessarily includes the manner of making indemnity selections by said company, its successors and assigns.

2. It is the duty of the Land Department to pass upon and determine all questions touching the validity of indemnity selections, including the adjudication of adverse claims made for the lands selected, and if found to be legal in all respects, to approve the selections; otherwise to reject them.

3. No title passes from the Government, nor does any vested right attach to lands within a Northern Pacific Railroad indemnity selection unless and until such selection receives the approval of the Secretary of the Interior.

4. When the indemnity selections are approved, the *equitable* title to the lands embraced therein passes under the grant.

5. The legal title does not pass from the Government until patent has issued.

The Secretary of the Interior cannot arbitrarily refuse to approve an indemnity selection made by the railroad company, or defeat such selection by failure or neglect to act

thereon. , *Williams* v. *United States,* 138 U. S. 514, 524; *Brown* v. *Hitchcock,* 173 U. S. 473, 478; *Dunnigan* v. *Nor. Pac. R. R. Co.,* 27 L. D. 467, 469. He has not finally passed upon these selections; that he must act upon them and determine all questions affecting their validity before the matters complained of can be carried into the courts by any person claiming an interest in the lands by reason of the indemnity selections. *New Orleans* v. *Paine,* 147 U. S. 261; *Germania Iron Co.* v. *United States,* 165 U. S. 379; *Brown* v. *Hitchcock,* 173 U. S. 475, and until approved, there are no selections in fact, only preliminary proceedings.

In respect to equitable rights to public lands this court has held:

.1. That until the legal title passes from the Government, inquiry as to all equitable rights comes within the cognizance of the Land Department. *Brown* v. *Hitchcock,* 173 U. S. 473, · 476. But until the title has passed to an individual the equities subject to which he holds it cannot be enforced in the courts. *Marquez* v. *Frisbie,* 101 U. S. 473, 475.

2. Until the legal title to public land passes from the Government the Land Department has jurisdiction to determine the question whether or not the equitable title has passed. *Michigan Land and Lumber Co.* v. *Rust,* 168 U. S. 589, 593; *Hawley* v. *Diller,* 178 U. S. 476, 488. But pending the determination of this question by the Land Department the courts will not pass upon the same in controversies between individuals, but will leave it to be determined by the Land Department. *Litchfield* v. *Register and Receiver,* 9 Wall. 575, 578; *United States* v. *Schurz,* 102 U. S. 378, 396; *New Orleans* v. *Paine,* 147 U. S. 261; *Brown* v. *Hitchcock,* 173 U. S. 473; *Cosmos Co.* v. *Gray Eagle Co.,* 190 U. S. 301, 308.

3. After the Land Department has passed upon all disputed questions of fact and finally determined that the equitable title to public lands has passed from the Government, but not before, the courts may inquire into and determine controversies between individuals in respect to the validity of such

equitable title, together with individual rights claimed thereunder, and will accept the findings of the Land Department as conclusive upon all questions of fact. *Moore* v. *Robbins,* 96 U. S. 530; *Marquez* v. *Frisbie,* 101 U. S. 473; *Johnson* v. *Drew,* 171 U. S. 92, 99; *Clark* v. *Herrington,* 186 U. S. 206, 210.

Within the principles as above set forth the courts are without jurisdiction in this case, so far as the unpatented lands are concerned, to grant the relief prayed for by the complainants for the reasons: (1) The legal title is still in the United States; (2) the Land Department has jurisdiction to determine the question whether or not the equitable title has passed; (3) the record shows that the Land Department is now considering this question and has not made a finding upon any questions of fact which may be involved.

It is not a fact, as alleged by complainants, that the Land Department has passed upon the asserted rights of the respective parties to the entered lands, nor has it decided that patents shall issue upon the entries. *Nor. Pac. R. R. Co.,* 26 L. D. 265. Until it does finally pass upon the asserted rights of such parties to these lands and decides to issue patents therefor, no vested rights attach thereto. While it is true that when the right to a patent once becomes vested, it is equivalent, so far as the Government is concerned, to a patent actually issued, *Barney* v. *Dolph,* 97 U. S. 652, 656; *Stark* v. *Starrs,* 6 Wall. 402, 418; *Simmons* v. *Waggoner,* 101 U. S. 260; it is equally true that the right to a patent to public land does not become *vested* "as against the United States until all the prerequisites for the acquisition of the title have been complied with, *Shepley* v. *Cowan,* 91 U. S. 330, 338; nor until conflicting claims, if any, to the lands have been finally determined by the Land Department. Cases cited *supra.* The Land Department retains jurisdiction in respect to public lands until patent has issued. *United States* v. *Schurz,* 102 U. S. 396; *Knight* v. *U. S. Land Association,* 142 U. S. 161.

Whether the erroneous decision of the Secretary of the Interior with respect to the eastern terminus of the Northern

Pacific land grant involved merely a question of law, a mixed question of law and fact, or only of fact, the entries in question made because of such erroneous decision are, nevertheless, subject to inquiry .by the Land Department and may be and should be canceled by it if found to be illegal. *Marquez* v. *Frisbie*, 101 U. S. 473; *United States* v. *Schurz, supra; Beley* v. *Naphtaly*, 169 U. S. 353, 364.

*Mr. Benton Hanchett* and. *Mr. H. H. Hoyt* for Avery and other appellees.

*Mr. Luther C. Harris* submitted a brief for Alger and other appellees.

Mr. Justice HARLAN, after making the foregoing statement, delivered the opinion of the court.

It is appropriate at the outset to refer to certain allegations of the bill which bring the determination of the case within a very narrow compass and make it unnecessary to. consider some matters referred to by counsel. After setting out in detail the various steps taken by the railroad company to acquire a right to the lands in dispute, the bill alleges that "but for the *vested* rights" of the Northern Pacific Railroad Company and its grantees the several tracts of land in question would have been unappropriated public lands open to the several kinds of entries or location made with respect to them, severally; also, that "the several applications and proceedings with respect to the said several entries were in due form, and regularly conducted, as required by law, and, *in the absence of the vested rights of the said Northern Pacific Railroad Company and its grantees in the said premises,* would have been operative and effectual to *invest the several entrymen of said lands with complete equitable title thereto,* each of such entries and locations having been finally receipted for, allowed and approved by the proper land officers of the United States; the only act

remaining for the United States or its officers to perform with respect to such entries being the issuance of the patent in cases where the patent has not already issued;" and that all of the said entries and locations of lands referred to in the exhibit filed with the bill were allowed, and the final certificates (and so far as issued the patents) issued therefor "under a mistake of law founded upon a certain erroneous ruling by the Secretary of the Interior, to the effect that the said Northern Pacific Railroad Company, and their successors in interest, were not entitled to any lands by virtue of said act of Congress, approved July 2, 1864, and said joint resolution approved May 31, 1870, granting lands to said Northern Pacific Railroad Company, east of that point on the line of said Northern Pacific Railroad where the same crosses the line of the St. Paul and Duluth Railroad, known as Thompson Junction."

Obviously, the first inquiry should be as to the object and scope of the act of 1898. Upon that point we do not think any doubt can be entertained, if the words of the act be interpreted in the light of the situation, as it actually was at the date of its passage. Here were vast bodies of land, the right and title to which was in dispute between a railroad company holding a grant of public lands, and occupants and purchasers —both sides claiming under the United States. The disputes had arisen out of conflicting orders or rulings of the Land Department, and it became the duty of the Government to remove the difficulties which had come upon the parties in consequence of such orders. The settlement of those disputes was, therefore, as the Circuit Court said, a matter of public concern. If the disputes were not accommodated, the litigation in relation to the lands would become vexatious, extending over many years and causing great embarrassment. In the light of that situation Congress passed the act of 1898, which opened up a way for an adjustment upon principles that it deemed just and consistent with the rights of all concerned—the Government, the railroad grantee, and individual claimants. The railroad company evinced its approval of this

action of the legislative department by a prompt acceptance of the act, in its entirety. By such unqualified acceptance the railroad company agreed that, so far as it had any claim to the lands in dispute, whatever the act of Congress required to be done might be done.

Promptly after the passage of that act the Land Department set about to administer its provisions, and to that end, as we have said, issued regulations for the guidance of all concerned.

During the progress of this work of administration, the railroad company, by conveyances to the present plaintiffs, assumed to pass such interest as it had in the lands here in question, with the effect—it is now claimed by the plaintiffs —to withdraw or exempt all the lands so sold from the operation of the act. The plaintiffs rest this claim upon that part of the act providing that the railroad grantee or its successor in interest "shall not be bound to relinquish lands sold or contracted by it or lands it uses or needs for railroad purposes, or lands valuable for stone, iron, or coal." (See Par. 3, ante, p. 486.)

We have seen that the act (Par. 2, ante, p. 486) made it the duty of the Secretary of the Interior to ascertain from time to time, and cause to be prepared and delivered to the railroad grantee or its successor in interest, a list or lists of the several tracts purchased, settled upon or occupied, and claimed, at the date of the act, by such settlers, purchasers or occupants, their heirs and assigns, according to the smallest Government subdivision. And the act provided that the railroad grantee or its successor should accept said list or lists "as conclusive, with respect to the particular lands to be relinquished by it." The contention of the plaintiffs, stated more fully, is, in effect, that it was competent for the company, notwithstanding its acceptance of the act, to take out of its operation any lands embraced by its terms, by simply selling or contracting to sell them before the delivery to it or to its successor in interest of the lists above mentioned. In other

words—for the contention comes to that—the railroad company, so far as the act of 1898 was concerned, could, notwithstanding the acceptance of its provisions and on the day after such acceptance, have sold or contracted to sell its right, title and interest in and to all the lands embraced by those provisions. This would have left no lands whatever to which the act could apply. Such a result would have left unsettled all the disputes relating to any lands which the company chose, in its own interest, to sell while the Land Department was proceeding under the statute. We do not believe that Congress intended that it should be in the power of the railroad company in any such mode to defeat the operation of the act. Congress, manifestly, had reference to the situation as it was when the act of 1898 was passed.

If any rights had become vested in the Northern Pacific Railroad Company which could not, against or without its consent, be effected by an enactment like that of 1898, then the objection to legislation, on the ground that it interfered with vested rights, was waived by the acceptance of the act by its successor in interest; for it was entirely competent for the latter company, if it succeeded to all the rights of the railroad grantee, to agree to such a settlement as that devised by Congress. The rights acquired by the definite location of the road, and any selection of lands based thereon, became, upon the acceptance of the act, and so far as that company was concerned, subject to such settlement as the Land Department might legally make under that act. It could not by any sale or contract, made after the acceptance of the act, interfere with the full execution of its provisions. And the plaintiffs who claim to have purchased from the successor in interest of the railroad grantee can occupy no better position than the company from which they purchased. They were in a sense purchasers *pendente lite;* for the Secretary of the Interior was, at the time, as he is now, engaged in administering the act of Congress. By him or under his direction must be ascertained the facts upon which depend the inquiry whether

the lands in question are within the indemnity limits of the land grant to the railroad company and so situated that a right to them attached by reason of the definite location of the road. He must also inquire whether such lands were purchased, by the respective defendants, directly from the United States, or were settled upon or claimed in good faith by qualified settlers under color of title or claim of right under a law of the United States or ruling of the Interior Department, and whether the purchaser, settler or claimant refuses to transfer his entry. Upon these facts also depends the right of the railroad grantee or its successor in interest (its rights being relinquished as provided in the act) to select in lieu of the lands relinquished an equal quantity of surveyed or unsurveyed public lands, not mineral or reserved, and not valuable for stone, iron or coal, and free from any adverse claim, or not occupied by settlers at the time of such selection, situated within any State or Territory into which the railroad grant extends.

Now it is sought, in advance of final action by the Land Department in execution of the act, to have it adjudged, *as between the parties to this suit*, that the lands in dispute, claimed by the defendants, cannot properly be placed on the lists which the Secretary may deliver to the railroad grantee or its successor in interest. But that is a question the solution of which depends, in part at least, on facts within the province, primarily, of the Secretary of the Interior to find. In short, he, and he alone, must ascertain the facts which enter into the question as to what lands are to go on the lists to be delivered to the railroad grantee or its successor in interest. The court should not, by any decree, as between parties who have no contract relations with each other, attempt indirectly to control the authority and discretion of that officer to determine what lands shall and what lands shall not be included in the lists to be prepared under his direction. The plaintiffs cannot invoke the aid of the court to have these questions concluded, even as between them and the defendants, by an admission made in their bill for the purposes of this case, that the final

certificates and final receipts held by the respective defendants will entitle them to the lands they claim but for the "vested" rights acquired by the railroad company in virtue of the definite location of its road. The court should not assume that they are embraced by the act, in order simply that it may have an opportunity, as between the present parties, to decide a question of law, which cannot appropriately arise until at least all the facts are ascertained by the Land Department and final action is taken under the statute of 1898. Although it may be true, as alleged in the bill, that the defendants, not holding patents, have received and hold final certificates or final receipts, and that, so far as they are concerned, nothing more remains to be done in the Department except to issue patents, yet it is in the power of the Department, even after decree here, in this suit, to reopen the case as to each defendant of that class, and, sufficient grounds existing therefor, recall or cancel such certificates or receipts. The whole matter, in respect of the lands in dispute, is yet in the hands of the Department undisposed of finally under the act of 1898. Congress intended that the Department should, within the limit and according to the rules prescribed by the act of 1898, settle the disputes that had arisen between the railroad grantee and settlers, although, after the matter has passed beyond the jurisdiction of the Department, such settlements may become the subject of judicial inquiry for the protection of the rights of parties against any error of law committed by the Department.

Those views are in entire accord with the former decisions of this court. In *Johnson* v. *Towsley*, 13 Wall. 72, 87, it was said: "This court has at all times been careful to guard itself against an invasion of the functions confided by law to other departments of the Government, and in reference to the proceedings before the officers intrusted with the charge of selling the public lands it has frequently and firmly refused to interfere with them in the discharge of their duties, either by mandamus or injunction, so long as the title remained in the

United States and the matter was rightfully before those officers for decision. On the other hand, it has constantly asserted the right of the proper courts to inquire, *after the title had passed from the Government,* and the question became one of private right, whether, according to the established rules of equity and the acts of Congress concerning the public lands, the party holding that title should hold absolutely as his own, or as trustee for another." So, in *Marquez* v. *Frisbie,* 101 U. S. 473, 475: "We have repeatedly held that the courts will not interfere with the officers of the Government while in the discharge of their duties in disposing of the public lands, either by injunction or mandamus. . . . After the United States has parted with its title, and the individual has become vested with it, the equities subject to which he holds it may be enforced, but not before. . . . We did not deny the right of the courts to deal with the possession of the land prior to the issue of the patent, or to enforce contracts between the parties concerning the land. But it is impossible thus to transfer a title which is yet in the United States." What was said in the case just cited as to the power of the court to interfere, in certain cases, in advance of the issuing of the patent, was no doubt in the mind of the Circuit Court when, in its opinion in this case, it said, 110 Fed. Rep. 465, 472: "It is unnecessary to decide whether a case may not arise when, even while the disputed question as to the rights of contesting parties to a tract of public land is pending or cognizable before the Land Department, a court of equity may properly interfere, by injunction at the suit of one of the claimants, to prevent the other claimant from despoiling the land by waste, and appropriating its substantial value, by denuding it of all its merchantable timber, before any final decision upon the disputed claims by the Land Department, which is only rendered by issuing the patent."

So, again, in *United States* v. *Schurz,* 102 U. S. 378, 395: "The Constitution of the United States declares that Congress shall have power to dispose of and make all needful rules

and regulations respecting the territory and other property belonging to the United States. Under this provision the sale of the public lands was placed by statute under the control of the Secretary of the Interior. To aid him in the performance of this duty, a bureau was created, at the head of which is the Commissioner of the General Land Office, with many subordinates. To them, as a special tribunal, Congress confided the execution of the laws which regulate the surveying, the selling, and the general care of these lands. Congress has also enacted a system of laws by which rights to these lands may be acquired, and the title of the Government conveyed to the citizens. This court has with a strong hand upheld the doctrine that so long as the legal title to these lands remained in the United States, and the proceedings for acquiring it were as yet *in fieri*, the courts would not interfere to control the exercise of the power thus vested in that tribunal. To that doctrine we still adhere." As late as *Bockfinger* v. *Foster*, 190 U. S. 116, 126, we reaffirmed the principle, "that the courts will not interfere with the Land Department in its control and disposal of the public lands, under the legislation of Congress, so long as the title in any essential sense remains in the United States."

These principles are applicable to the particular scheme devised by the act of 1898 in reference to the lands in dispute. When the Land Department shall have done all that it can do in execution of the act of Congress, as to any particular lands in dispute, it will be time enough for interested private parties claiming an interest in them to invoke the aid of the courts for the determination of such questions of law as may arise out of the action of the Department. It is true that no order is asked here that will directly or in terms operate upon the Land Department. But a decree is asked, as between the parties now before the court, which must necessarily control or affect the action of the Department in respect of matters committed to it by Congress. Such interference by the court, although between private claimants only, would be in-

appropriate, especially as to lands covered by the act of
1898.

What has been said is peculiarly applicable to the un-
patented lands in dispute. It is equally applicable to lands
patented both before and after the passage of the act, if such
lands are *in dispute* and *belong to either of the classes described
in the act of 1898.* We agree with the Circuit Court that the
act "gives the option to keep or relinquish the disputed land
to the individual claimant in every instance. If he elects to
retain that land, it is to be listed by the Secretary in lists to
be furnished to the railroad claimant, who must relinquish,
and whose consent to this was given by the acceptance of the
act." In case of such relinquishment by the railroad com-
pany, it acquires a right to select other lands in place of those
retained by the individual claimant. If the individual claim-
ant, having a patent, elects to surrender his right, then he must
reconvey to the United States, and will then be entitled to
select other lands in lieu of those surrendered. So that the
statute embraces both patented and unpatented lands, in
respect of which the railroad company or its successor in in-
terest claims that a right thereto attached by the definite
location of its road or by selection, provided they are also such
lands as were originally "purchased directly from the United
States or settled upon or claimed in good faith by any qualified
settler under color of title or claim of right under any law of
the United States or any ruling of the Interior Department."
The duty of a court of equity not to interfere with parties in
the prosecution of their rights under the act, whereby the
execution of its provisions in advance of final action by the
Department would be embarrassed by judicial decision, is
quite as imperative in cases of the patented lands in dispute
as in the cases of unpatented lands. This view is not at all in
conflict with those cases in which it has been held that after
a patent issued for public lands the only remedy for one who
claims the land, as against the patentee, is to bring a suit
against the person holding the patent, and obtain a decree de-

claring the patentee a trustee for the party suing. This general principle does not apply to cases embraced by the act of 1898. That act is peculiar in its provisions, and contemplates that the individual claimant of one of the classes described in it may hold the land patented to him, if he elects to retain it, and that the railroad grantee or its successor in interest can be made whole by taking lieu lands in place of those claimed in virtue of definite location or selection.

For the reasons stated, neither the claim of vested rights in behalf of the railroad grantee, nor the contention that the lands in dispute, having been sold to the plaintiffs, were not for that reason embraced by the act of 1898, furnishes any ground for interference by a court of equity or for the granting of the relief asked.

This conclusion is fortified, if not absolutely demanded, by another consideration, namely, that no title to indemnity lands is vested until a selection be made by which they are definitely ascertained, and the selection made *approved by the Secretary of the Interior.* This principle is firmly established. A full statement of it is found in *Wisconsin Central R. R.* v. *Price County,* 133 U. S. 496, 511. The court there said: "He [the Secretary] was required to determine, in the first place, whether there were any deficiencies in the land granted to the company which were to be supplied from indemnity lands; and, in the second place, whether the particular indemnity lands selected could be properly taken for those deficiencies. In order to reach a proper conclusion on these two questions he had also to inquire and determine whether any lands in the place limits had been previously disposed of by the Government, or whether any preemption or homestead rights had attached before the line of the road was definitely fixed. . . . *Until the selections were approved* there were no selections in fact, only preliminary proceedings taken for that purpose; *and the indemnity lands remained unaffected in their title.* Until then, the lands which might be taken as indemnity were incapable of identification; the proposed selections remained the

property of the United States. The Government was, indeed, under a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, until it was executed, created no legal interest which could be enforced in the courts." In *New Orleans Pacific Railway* v. *Parker,* 143 U. S. 42, 57, 58, it was said: "As to lands within the indemnity limits, it has always been held that no title is acquired until the specific parcels have been selected by the grantee, and approved by the Secretary of the Interior." And in *Michigan Land & Lumber Co.* v. *Rust,* 168 U. S. 589, 592, 593, the court said: "Generally speaking, while the legal title remains in the United States, the grant is in process of administration and the land is subject to the jurisdiction of the Land Department of the Government." To the same effect are *Sioux City &c. Railroad* v. *Chicago, Milwaukee &c. Railway,* 117 U. S. 406, 408; *United States* v. *Missouri &c. Railway,* 141 U. S. 358, 374; *Brown* v. *Hitchcock,* 173 U. S. 473, 479; *Kansas Pacific Railroad* v. *Atchison &c. Railroad,* 112 U. S. 414, 421; *Barney* v. *Winona & St. Peter Railway,* 117 U. S. 228, 232; *Grinnell* v. *Railroad Co.,* 103 U. S. 739; *St. Paul &c. Railroad* v. *Winona & St. Peter Railroad,* 112 U. S. 720, 731; *Cedar Rapids & Missouri River Railroad* v. *Herring,* 110 U. S. 27.

Now, the lands here in dispute and claimed by the plaintiffs as grantees of the Northern Pacific Railway Company (the alleged successor in interest of the Northern Pacific Railroad Company) are lands admittedly within indemnity, as distinguished from granted or place, limits. The mere filing of lists of selections, after the acceptance of the map of definite location of the railroad line between Duluth and Ashland, gave the company no such title as could be enforced by the courts in a suit between private parties. It is true the Government was under a promise to give the railroad company lands in the indemnity limits to supply losses in place limits. But, as adjudged in the above cases, that promise passed no title. The promise will no doubt be fulfilled by the Govern-

ment in due time, and in its own way. The selections not having been approved by the Secretary, the title remains in the Government. So that the plaintiffs, having no greater rights than those of the railroad grantee or its successor, has no such interest in the particular lands, specified in the railroad company's lists of unapproved selection, as entitles it, while the title remains in the United States, and while these lands are being administered by the Land Department, to ask a court of equity to decide, as between them and the defendants, that the latter could not by any entry or purchase acquire an interest after the acceptance by the Secretary of the railroad's map of definite location.

But it is suggested that the final action of the Department may be indefinitely postponed, to the great injury of the railroad grantee and those claiming under it. Delay in such matters was a contingency which the alleged successor in interest of the railroad grantee must have taken into account when accepting the act and assenting to the plan of settlement embodied in it. The Land Department was not required to complete its administration of the statute within any designated time. The act, upon its face, directs that the required lists be prepared and delivered to the railroad company "as soon as conveniently may be done." It cannot be assumed upon this record that the Department has not progressed with the work of administration as rapidly as all the circumstances and its convenience permitted. Even if the fact be otherwise, it is not for a court of equity, by its decree to decide, in the first instance, that the selections made by the railroad company of lieu lands shall be approved by the Secretary, or to decide what lands should be on the lists required to be furnished to the railroad granted under the act of 1898; or to control directly or indirectly the work which Congress, with the assent of the railroad grantee, has committed to one of the Departments of the Government, or by an order interfere with the prosecution by the defendants of their claims under the act of 1898.

We are of opinion that the bill should have been dismissed upon the ground that a court of equity should not, in advance of the final action by the Secretary of the Interior in respect of lands embraced by the act of 1898, interfere with the regular and orderly administration of its provisions by means of a decree directed against claimants under that act. And without now expressing any opinion as to what questions may be raised by a claimant after such final action by the Land Department under that act, we adjudge that such dismissal must be without prejudice to any suit that may, according to established principles, be rightfully instituted by a claimant after the jurisdiction of the Department in respect of any particular lands has ceased. Thus modified, the decree of the Circuit Court must be affirmed.

*It is so ordered.*

Mr. Justice Brewer took no part in the decision of this case.