## STANDARD OIL CO. OF CALIFORNIA et al. v. UNITED STATES.
### No. 8985.

Circuit Court of Appeals, Ninth Circuit.

Nov. 16, 1939.

As Corrected Jan. 2, 1940.

MATHEWS, Circuit Judge, dissenting.

408

Oscar Lawler, of Los Angeles, Cal., Donald R. Richberg, of Washington, D. C., Eugene Prince, of San Francisco, Cal., and Wm. H. Burges, of El Paso, Tex., for appellant and cross-appellee, Standard Oil Co. of California.

Ray W. Hays, of Fresno, Cal., for appellants and cross-appellees Carman, Fairbank, et al.

John W. Preston, Sp. Counsel for the United States, of Los Angeles, Cal., and Annette Abbott Adams, Asst. Sp. Counsel for United States, of San Francisco, Cal. for appellee and cross-appellant.

Earl Johnson, of Los Angeles, Cal., and Edward D. Landels, of San Francisco, Cal., for California Land Title Ass'n, amici curiae.

Before GARRECHT, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The United States brought suit against the Standard Oil Company of California and others to quiet its title to Section 36, Township 30 South, Range 23 East of Mt. Diablo Meridian in California. The bill prayed also for an accounting and for other relief. After a trial to the court a decree was entered quieting title in the Government and awarding damages in the sum of $6,214,102.42. From this decree a number of the defendants, including the Standard Oil Company, have appealed. The United States, asserting error in the amount awarded, prosecutes a cross appeal.

The earlier history of the litigation is to be found in West v. Standard Oil Co., 278 U.S. 200, 49 S.Ct. 138, 73 L.Ed. 265, and need not be repeated. The controversy had its beginning in 1914 when the Secretary of the Interior, upon the report of a field representative, initiated departmental proceedings charging that the section—a part of the school grant of sections 16 and 36 under the act of March 3, 1853, 10 Stat. 244—was known to be mineral at and prior to its survey.[1]

After the decision in West v. Standard Oil Co., supra, the departmental contest, which had been renewed on amended charges by order of Secretary Work (51 L.D. 141), proceeded before a substitute register, and there were extended hearings at various places in California. At their conclusion the register dismissed the charges and his action was affirmed by the Commissioner of the General Land Office. The United States appealed to the Secretary, who ultimately rendered a decision finding as a fact that the section was known to be mineral in character at the time of the approval of the survey, and holding that title thereto remained in the United States. 55 I.D. 121, 532. This suit followed.

On the trial below the court declined to receive further testimony but admitted in evidence the record and testimony in the land office contest. It held that the Secretary's decision as to the known mineral character of the land was conclusive if supported by evidence. The land office record was read and considered for the purpose only of determining whether there was evidence in support of the finding there made. The Standard contends that the court's examination went no further than to see whether the record contained *any* evidence to support the Secretary's conclusion. However, it is clear from the opinion below (D.C., 21 F.Supp. 645, 653), as well as from the findings, that the court was satisfied that the Secretary's decision was based on substantial evidence. Cf. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126.

Appellants demanded a trial de novo of the issue of known mineral character, and the argument here revolves largely around the contention that the trial court was in error in declining to make an independent determination of the fact. The position of the Standard is that the proceeding in the department was purely informative, having no purpose or effect other than to guide the Secretary in determining whether the facts warranted court action.[2] In any event, it is contended, the known mineral character of the

---

[1] The survey was approved January 26, 1903.

[2] In West v. Standard Oil Co., supra, the court (278 U.S. page 207, 49 S.Ct. page 139, 73 L.Ed. 265) observed that "Upon the ultimate findings, the Commissioner decides, subject to the supervision and control of the Secretary, what

land is a judicial question which the court must determine for itself—even though the determination be made on the land office record. On the latter point, the Standard stresses the observation in West v. Standard Oil Co., supra, to the effect that if the land was not known to be mineral as of the approval of the survey, the legal title passed to the state on that date. It is argued, chiefly on the authority of Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 838, 35 L.Ed. 428, Borax Consolidated Ltd. v. Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L. Ed. 9, and Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598, that if title to the land had passed out of the United States the department had no jurisdiction over it, and that the question whether or not title had passed is a jurisdictional question not determinable by the executive department except for the purpose of governing its own conduct in the administration of its functions.

1. Administrative Authority Of The Secretary.

It may serve better to understand the difficulty which this branch of the appeal presents if we dispose first of some difficulties it does not present. The cases on which counsel rely are of no help in the resolution of the controversy, for they had to do with situations foreign to the one before us. General expressions used in them must necessarily be read in the light of the facts with which the court dealt.

In Hardin v. Jordan, supra, the holding was that an unrestricted grant by the United States of its public lands bounded on a lake or pond is to be construed, as to its effect, according to the law of the state in which the land lies. The situs of the land for which patent had issued was in Illinois, and under the law of that state the grantee took ratably to the center of the lake. In a later patent the land office attempted to convey the submerged land, treating the earlier patent as a transfer of title to the margin only of the lake. It was held that since the earlier patent, as construed under local law, had operated to transfer the title, the department lost jurisdiction over the land and had no authority to dispose of it again. The case presents no recognizable analogy. More-

over, it was directly held in West v. Standard Oil Co., supra, that the department retained jurisdiction over the parcel here in dispute.

In Borax Consolidated Ltd. v. Los Angeles, supra, the court was dealing with a controversy between one claiming title to tide lands and one claiming title under patent from the United States. If the lands were in fact tide lands they were not public lands and never had been, but had always been the property of the state. It was held that the jurisdiction of the department extends only to the public lands and that it has none over tide lands. Hence, if the lands were of the latter description the department was powerless to convey them. Here, however, we have to do confessedly with a grant of public lands; and as to the continued jurisdiction of the department over the disputed tract, see, again, West v. Standard Oil Co., supra.

In Crowell v. Benson, supra, the constitutional right of the citizen involved was his right to be free from the burden of liability without fault, unless the facts brought him within the reach of Congressional power under Art. III, sec. 2 of the Constitution, U.S.C.A. No analogous constitutional right is in jeopardy in the present instance. The disposal of the public lands is not a subject over which the "judicial power" of the United States is extended. It is a field in which the authority of the Congress is supreme. Lee v. Johnson, 116 U.S. 48, 6 S.Ct. 249, 29 L.Ed. 570; Art. IV, sec. 3, clause 2, of the Constitution, U.S.C.A. Where Congress grants public lands to a state, reserving those known to be mineral as of the approval of the survey, it is thought that there is no constitutional impediment to its delegating to any instrumentality it may select the authority of determining, as a fact, what lands fall within the excluded class. Compare Shields v. Utah & Idaho R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111. The state or its transferees obviously have no constitutional right to demand the property on terms differing from those imposed. Their claim to the land does not derive from the Constitution. Nor is the power of Congress, under the broad au-

action, if any, shall be taken. Compare George W. Dally, 41 L.D. 295, 299." On examination of the Secretary's decision in the Dally case it becomes plain that the "action" to be taken, under the di-

rection of the Secretary, is the rendition of a judgment; not, as appellants argue, the possible institution of court proceedings.

thorization of that document, so limited as to require the fact-finding agency to make its determination at or prior to the approval of survey.

■ The problem, then, as we understand it, is not what authority Congress may confer upon the Secretary, but what authority it has conferred in relation to the administration of this grant. If Congress has clothed the Secretary with general authority to administer the grant, and if his decision of fact in this instance was made within the scope of such authority, there can be no doubt that his decision is conclusive on the courts, in the absence, at any rate, of fraud or imposition. The holdings to this effect are too numerous for citation, but among those apposite are Catholic Bishop of Nesqually v. Gibbon, 158 U.S. 155, 15 S.Ct. 779, 39 L.Ed. 931; Cameron v. United States, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659; St. Louis Smelting & Refining Co. v. Kemp, 104 U. S. 636, 26 L.Ed. 875; Wright v. Roseberry, 121 U.S. 488, 7 S.Ct. 985, 30 L.Ed. 1039; Burke v. Southern Pacific R. Co., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527; Johnson v. Drew, 171 U.S. 93, 99, 18 S.Ct. 800, 43 L.Ed. 88. Of course, in order to give conclusive effect to his decision, the Secretary's power in the premises must be exercised within the limits of due process, that is, after notice and hearing and upon evidence. Cameron v. United States, supra; Crowell v. Benson, supra; Shields v. Utah & Idaho R. Co., supra. Compare Iron Silver M. Co. v. Campbell, 135 U.S. 286, 10 S.Ct. 765, 34 L.Ed. 155. But there is here no question of due process. Appellants participated in the proceeding before the department and make no complaint that they were not accorded full opportunity to present their evidence.

On the question of the administrative authority of the Secretary we turn to the general statutes and to the provisions of the granting act. By 5 U.S.C.A. § 485 the Secretary is charged with the supervision of public business relating to the public lands, including mines. By the act of February 18, 1875, 18 Stat. 317, 43 U.S.C.A. § 2, the Commissioner of the General Land Office is required to perform, "under the direction of the Secretary of the Interior, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such lands, and, also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government."

So far as material, § 6 of the act of March 3, 1853, 10 Stat. 246, provides that all public lands in California, whether surveyed or unsurveyed, with the exception of the 16th and 36th sections in each township, "which shall be and hereby are granted to the State for the purposes of public schools," and with numerous other exceptions, shall be subject to the preemption laws. Where unsurveyed lands are claimed by preemption, notice of such claim is required to be filed within a limited time after survey. The provisions of § 7 of the act are as follows:

"That where any settlement, by the erection of a dwelling-house or the cultivation of any portion of the land, shall be made upon the sixteenth and thirty-sixth sections, before the same shall be surveyed, or where such sections may be reserved for public uses or taken by private claims, other land shall be selected by the proper authorities of the State in lieu thereof, agreeably to the provisions of the act of Congress approved on the twentieth of May, Eighteen Hundred and twenty-six, entitled 'An act to appropriate lands for the support of schools in certain townships and fractional townships, not before provided for,' and which shall be subject to approval by the Secretary of the Interior. And no person shall make a settlement or location upon any tract or parcel of land selected for a military post, or within one mile of such post, or on any other lands reserved by competent authority; nor shall any person obtain the benefits of this act by a settlement or location on mineral lands."

■ Lands known to be mineral at the time of the acceptance of the survey by the General Land Office were by implication excluded from the operation of this grant. Ivanhoe Mining Co. v. Keystone Consol. Mining Co., 1880, 102 U.S. 167, 26 L.Ed. 126; United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599.

■ The grant is of public lands, with numerous unidentified reservations or exceptions. It is obviously one requiring extensive administration. The authority of the Secretary in relation to it is not limited to the mere making and approval of the survey. It is true that patent is not necessary to transfer title to the state and none is issued, but there are many and

varied situations in which the state's title is liable to defeat at the hands of private claimants; and in these situations the land office must necessarily function. Thus the departmental tribunals must decide between adverse claimants and the state, or its transferees, in cases of preemption claims arising out of asserted settlement prior to survey, Giovanni Le Franchi, 3 L.D. 229;[3] in connection with applications for mineral entries, Work v. Braffet, 276 U.S. 560, 48 S.Ct. 363, 72 L.Ed. 700; Fleetwood Lode, 12 L.D. 604; Pereira v. Jacks, 15 L.D. 273; Keystone Lode v. Nevada, 15 L.D. 259; and in like instances, Shepley v. Cowan, 91 U.S. 330, 23 L. Ed. 424. And, conversely, where the state asserts the right to make lieu selections, using as a base lands in sections 16 or 36, the land office must determine whether or not the facts exist upon which the right of the state to make indemnity selections depends. To the Secretary is delegated in all such matters the authority of deciding as a fact whether a particular section or any part of it falls within the grant or within an exception.

It is important to note that these administrative processes are necessarily carried on at a time subsequent to the approval of the survey. The responsibility of the department in relation to the grant does not end, but in large measure begins, at that time; and its administrative jurisdiction continues until terminated by the exercise of it. West v. Standard Oil Co., supra. Our attention has not been called to any case holding that the factual determinations of the department in proceedings such as those discussed are open to reexamination in the courts—certainly not where the state or other claimants have had opportunity to contest the facts before the land office tribunals. The whole trend of judicial opinion has been to the contrary.

Actual discovery of mineral is not necessary to prevent the passage of title to the state. United States v. Southern Pacific Co., 251 U.S. 1, 40 S.Ct. 47, 64 L.Ed. 97; Diamond Coal & Coke Co. v. United States, 233 U.S. 236, 34 S.Ct. 507, 58 L.Ed. 936. Known mineral lands embraced in the general grant remain subject, after survey, to location and disposition under the mineral laws, Work v. Braffet, supra, or to withdrawal from entry in the interest of the whole body of the nation. In doubtful cases, at least, the determination of known mineral character is an essential step in the identification of the land granted, as much so as is its identification by survey. Compare Wright v. Roseberry, supra; Rogers Locomotive Machine Works v. American Emigrant Co., 164 U.S. 559, 17 S.Ct. 188, 41 L.Ed. 552. In such cases the state's title remains imperfect or inchoate, Rogers Locomotive Machine Works v. American Emigrant Co., supra, or "presumptive", Work v. Braffet, supra, until the determination has been made.

Normally the departmental determination cannot be made, either in an adversary proceeding involving the state or on application by the state for lieu selections, until after the survey has been approved. It often happens, as it did here, that there is a delay of some years between the actual survey and its approval. Neighboring discoveries in the intervening period, advance in knowledge of geological structures, or more thorough prospecting, may have completely altered the picture as of the crucial date of the survey's approval. The department does not have all parts of the public domain under observation at all times, and it may be a matter of years before field investigations lead to action. The fact that the title meanwhile remains in abeyance is an unavoidable defect in this type of grant; but the uncertainty is not greater if the matter is one for de-

[3] Compare Sherman v. Buick, 93 U.S. 209, 23 L.Ed. 849. That suit involved a question of law, whether the right to make preemption settlements on unsurveyed school lands was limited or unlimited in time. The plaintiff, in support of his patent, offered to prove settlement prior to survey, so that, as in Ivanhoe Mining Co. v. Keystone Consol. Mining Co., supra, the question of the finality of the land office decision was not presented. Apparently the state or its transferee had not had opportunity to contest the fact of settlement in the land office. Relative to the preemption settlement, the court observed that "these things being found to exist when the survey ascertained their location on a school section, the claim of the State to that particular piece of land was at an end; and, being shown in the proper mode to the proper officer of the United States, the right of the State to that land was gone, and in lieu of it she had the right to select other land agreeably to the Act of 1826, subject to the approval of the Secretary of the Interior." Sherman v. Buick, 93 U.S. 209, 214, 23 L.Ed. 849.

partmental administration rather than for decision in the courts—that is to say, there would be no lessening of the uncertainty if it were to be held that the effective administration of the grant lies in the courts rather than in the land office tribunals.[4]

 The Secretary's administrative authority is clearly coextensive with all the provisions of the grant, those implied as well as those expressed. In Catholic Bishop of Nesqually v. Gibbon, supra, 158 U.S. pages 166, 167, 15 S.Ct. page 784, 39 L.Ed. 931, the court said: "It may be laid down as a general rule that, in the absence of some specific provision to the contrary in respect to any particular grant of public land, its administration falls wholly and absolutely within the jurisdiction of the commissioner of the general land office, under the supervision and direction of the secretary of the interior. It is not necessary that with each grant there shall go a direction that its administration shall be under the authority of the land department. It falls there, unless there is express direction to the contrary." And see Cameron v. United States, supra; West v. Standard Oil Co., supra; Orchard v. Alexander, 157 U.S. 372, 383, 15 S.Ct. 635, 39 L.Ed. 737; Michigan Land & Lumber Co. v. Rust, 168 U.S. 589, 593, 18 S. Ct. 208, 42 L.Ed. 591; Cosmos Exploration Co. v. Gray Eagle Oil Co., 190 U.S. 301, 308, 24 S.Ct. 860, 47 L.Ed. 1064. The Secretary's authority, we think, extends not alone to the determination of contests adverse to the state's claim of title, initiated by private parties, but to the decision of those instituted on behalf of the United States.

In his decision vacating Secretary Fall's order dismissing the contest relating to the land here in dispute, Secretary Work said: "It is the statutory duty of the Secretary of the Interior to determine the character of land as a prerequisite to its disposition and as a determination as to whether or not it passed under grants like the one in question, or whether, because of its mineral character, it was, under the law, reserved to the United States for other disposition, as provided by applicable statutes." State of California, Standard Oil Company of California et al., transferees, 51 L.D. 141. It is not without significance that this view of the de-

partment's authority was in the minds of the justices at the time of the decision in West v. Standard Oil Co., supra. The ruling of the Secretary was referred to without adverse comment in the court's opinion in that case.

 If, as we hold, the decision of Secretary Ickes in the present contest was within the scope of his administrative authority, we are satisfied it is nonetheless conclusive because made in an adversary proceeding initiated in the public interest. In Cameron v. United States, supra [252 U.S. 450, 40 S.Ct. 412, 64 L.Ed. 659], where the authority of the Secretary to conduct a proceeding of that nature was challenged, it was held that "by general statutory provisions the execution of the laws regulating the acquisition of rights in the public lands and the general care of these lands is confided to the land department, as a special tribunal; and the Secretary of the Interior, as the head of the department, is charged with seeing that this authority is rightly exercised to the end that valid claims may be recognized, invalid ones eliminated, and the rights of the public preserved." The Secretary's factual determination was there held to be conclusive. And in West v. Standard Oil Co., supra, it was said of the land here in suit that if Secretary Fall had determined as a fact that it was not known to be mineral on January 26, 1903, his determination would, ordinarily, be conclusive on the courts, "even if there were demonstrable error in the admission, or appreciation of evidence." Obviously, a contrary finding would be equally conclusive on the courts, unless it be assumed that the Secretary has authority only to find the fact one way.

The land office procedure here followed was appropriate for the discharge of the Secretary's responsibility. It was said in West v. Standard Oil Co., supra, that this contest was of the kind commonly employed by the Secretary in cases where the title of one claiming public land is questioned in the department. Authorization for such contests is contained in Circular No. 460, promulgated February 26, 1916 (44 L.D. 572). The purpose ascribed to the proceeding in the circular itself is "to secure speedy action upon claims to the public lands, and to allow claimant,

---

[4] While the legislation is not applicable to this case, the Act of Jan. 25, 1927, 44 Stat. 1026, 43 U.S.C.A. §§ 870, 871, in large measure eliminates these uncertainties.

entryman, or other claimant of record, opportunity to file a denial of the charges against the entry or claim, and to be heard thereon if he so desires." The circular prescribes elaborate rules for such contests, for the summoning and examination of witnesses, and for service upon all parties in interest of notice analogous to process. In respect of the charges made, Rule 11 prescribes that the government assumes the burden of proving them, unless otherwise ordered.

■ This circular is a regulation promulgated under authority of the statute empowering the Commissioner, under the direction of the Secretary, "to enforce and to carry into execution, by appropriate regulations, every part of the provisions of this title not otherwise specially provided for."[5] 43 U.S.C.A. § 1201. Regulations of the sort exemplified by the circular, when not repugnant to the acts of Congress, have the force and effect of laws; and they are noticed judicially. Cosmos Exploration Co. v. Gray Eagle Oil Co., 9 Cir., 112 F. 4, 61 L.R.A. 230, affirmed, 190 U.S. 301, 24 S.Ct. 860, 47 L.Ed. 1064. The proceedings provided for by the regulation, as is plain from the terms of the latter and from the applicable rules of practice (48 L.D. 246), are formal trials not differing in purpose or effect from those involving private contests. This view of their nature is borne out by the reported land office decisions.[6] In all of these contests the quasi-judicial character of the proceeding is apparent; and there can be no doubt that the department itself has always acted on the assumption that it functions in these matters judicially, and under compulsion of law.[7]

■ It is urged that the Secretary was here charged with no duty of reaching an impartial decision on the facts, but that, to the contrary, he was under the obligation of deciding the contest in favor of the Government if he could. As authority for this concept of the Secretary's province appellants quote from the opinion in West v. Standard Oil Co., supra (278 U.S. page 219, 49 S.Ct. page 144, 73 L.Ed. 265), to the effect that "Secretary Fall owed no active duty to the state or to any other claimant. His duty in respect to the land was solely that owed to the United States—the duty to preserve its interests therein. The inquiry directed to be made in the local land office had been ordered by a predecessor solely in the performance of that duty."

This language, read with its context, does not carry the meaning appellants ascribe to it. The court was there speaking of Secretary Fall's assumed power of deciding in favor of the adverse claimants irrespective of the known mineral character of the land. The court thought that the Secretary had no such power, hence no duty to perform in that respect. His was not the function of effecting title in the state without determining whether the land fell within the excluded class. To ascribe such authority to him would be to make of the officer "an agent rather for

[5] It was said by Assistant Secretary Finney in United States v. Central Pacific Ry. Co., 49 L.D. 465, that "proceedings instituted on charges preferred by government representatives have long been governed by special instructions." The first instructions in the reported land decisions are those of May 8, 1884 (2 L.D. 807). The instructions or regulations of May 8, 1884 were followed by those of November 4, 1895, 21 L.D. 367; July 16, 1898, 27 L.D. 239; August 18, 1899, 29 L.D. 141; February 14, 1906, 34 L.D. 439; September 30, 1907, 36 L.D. 112; January 19, 1911, 39 L.D. 458; and those of February 26, 1916, under which the departmental proceedings in question were held. The proceeding inaugurated January 14, 1914 was under authority of the 1911 circular. From a cursory examination of these circulars it appears that, for present purposes, there has been no substantial change in them since 1884.

[6] In the Digest of Decisions of the Department of the Interior Relating to Public Lands, under the table "Circulars and Instructions Cited, Construed, and Modified", numerous decisions are cited which involve proceedings under the circulars mentioned in the preceding note, antedating Circular No. 460.

[7] Secretary Work, in his decision vacating Secretary Fall's order dismissing the contest relating to the land here in dispute, said: "The long established and general practice of the Department of the Interior in land matters is that determinations are not made either upon reports of special agents or upon the statements of parties in interest in controverted matters, but that hearings or trials are ordered and held, at which all parties in interest may present testimony and where witnesses may be examined and cross-examined, as is customary in such proceedings." 51 L.D. 141.

relinquishing than for preserving the rights of the United States in the public lands." His sole function was to see to it that the will of Congress was effected, which was to recognize the state's claim of title if the land was not of known mineral character, otherwise to eliminate it. Authority to determine that matter, the court said, "falls naturally to the Secretary as 'the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States' to public lands."

The Secretary's duty of preserving this heritage of the nation is properly exercised only through his faithful observance of the pertinent acts of Congress. It is as much the duty of the Secretary to extend recognition to lawful claims as it is to eliminate those found to be invalid. This has been the historic concept of the Secretary's trust.[8] The fact that the United States is a party to the controversy does not operate to transform the officer into an advocate. In his decision of this controversy Secretary Ickes gave recognition to the principle that in these matters he functions as a judicial officer, not as a partisan. If it had been otherwise, his decision would be subject to attack on the ground of mistake in law, resulting in constructive fraud. And appellants expressly disclaim fraud in the decision.

We conclude, on this phase of the appeal, that the trial court rightly denied a trial de novo on the question of the known mineral character of the land; and that the record made before the department was to be examined only for the purpose of determining whether the finding of the Secretary was based on evidence.

2. Sufficiency Of The Evidence.

The trial court found "that it is not true that there is no evidence in the record in the said land office proceeding to support the decision of the Secretary of the Interior therein; but that, on the contrary, there is sufficient evidence in the said record in said proceeding to sustain the decision." With this finding we are in agreement.

A summary of the voluminous evidence taken before the Department is not possible within any reasonable compass, and the task need not be attempted. Available for examination is the opinion below, D.C., 21 F.Supp. 645, 651-653, where some of the salient testimony is reviewed, and the extended statement of the evidence on both sides as contained in the reported decision of the Secretary, 55 I.D. 121.. Part of the lands involved in the cognate case of United States v. Southern Pacific Co., 251 U.S. 1, 40 S.Ct. 47, 64 L.Ed. 97, adjoins the section in suit, and in that case the known mineral character of the lands as of 1904 was in issue. The court's opinion contains (251 U.S. page 12, 40 S.Ct. 47, 64 L.Ed. 97) a summary of the observable geological and other physical conditions in Township 30 and the adjacent region in 1903 and 1904, as disclosed by the proof in that case. So far as concerns the natural conditions, much the same showing is found in the record before us.

That the land was in fact mineral has been demonstrated by experience. In support of the Government's contention that it was known to be such during and prior to 1903, geologists of repute gave opinion testimony based on the observed and observable conditions subject to appraisal at that time in the light of the knowledge then obtaining and the theories then prevalent. Oil men and mineral prospectors familiar with the locality before and during 1903 testified to the belief of themselves and others as of that and previous years. We are not concerned with the credibility of these witnesses or with the weight to be given their testimony, but with the question only whether the proper legal test was applied. As to this it is apparent that the Secretary was guided by the standard set in United States v. Southern Pacific Co., supra, and Diamond Coal & Coke Co. v. United States, 233 U.S. 236, 34 S.Ct. 507, 58 L.Ed. 936, in which it was held that proof of known mineral character is not dependent upon a showing of actual discovery.

In the Southern Pacific case [251 U.S. 1, 40 S.Ct. 49, 64 L.Ed. 97], following the

---

8 In 1887, in Pueblo of San Francisco, 5 Dec.Dep.Int. 483, 494, Secretary Lamar, later Associate Justice of the Supreme Court, said, "the statutes, in placing the whole business of the department under the supervision of the Secretary, invest him with authority to review, reverse, amend, annul, or affirm all proceedings in the department having for their ultimate object to secure the alienation of any portion of the public lands, or the adjustment of private claims to lands, with a just regard to the rights of the public and of private parties."

Diamond Coal & Coke Co. decision, the test was stated to be whether "the known conditions [at the time of patent] were such as reasonably to engender the belief that the lands contained oil of such quality and in such quantity as would render its extraction profitable and justify expenditures to that end." In applying such a test, rather than that of actual discovery, it is obvious that a wide field of inquiry is opened up. It was not necessary to show that appellants themselves, in 1903, believed the land to be valuable for oil, or that there was unanimity of contemporary opinion to that effect. The erection of such standards would require, in the one case, proof of fraud, and, in the other, proof of conditions pointing so unerringly to the existence of valuable oil deposits as to be the equivalent of actual discovery. Nor, as we understand the rule laid down in the controlling decisions, need it be shown that contemporary belief was such as to prompt a willingness immediately to risk money in the exploitation of the land. On this point there is persuasive evidence that the then prevailing market for oil was unfavorable to new development and continued to be so for a number of years.

■■ Appellants rely on a supposed "rule of property" growing out of a regulation issued by Secretary Hitchcock on March 6, 1903 (32 L.D. 39). This provided that a lieu selection could not be made by the state for a school section, whether returned by the Surveyor-General as mineral or not, unless there had been an actual discovery of mineral.

In 1905 the rule was discarded by the same Secretary. 34 L.D. 194. The discovery test in relation to school or other grants had found no important recognition in the decisions of the courts and there is no persuasive evidence that it had any definite standing within the Department prior to the regulation promulgated in 1903. Compare Don C. Roberts, 41 L.D. 639; Kern Oil Co. v. Clotfelter, 1901, 30 L.D. 583. It was wholly repudiated in Diamond Coal & Coke Co. v. United States, 1914, supra [233 U.S. 236, 34 S.Ct. 512, 58 L.Ed. 936], where it was said that "there is no fixed rule" to that effect, but that the rule is rather to the contrary; and was rejected as regards oil lands in United States v. Southern Pacific Co., 1919, supra.

Secretary Hitchcock's regulation was not in effect at the time of the approval of this survey. In any event, we think, the rule of discovery had no such standing or frequent recognition in the administration of public land grants as would make of it a settled legal principle governing the ownership and devolution of property. 54 C.J. 1110. See American Mortgage Co. v. Hopper, 9 Cir., 64 F. 553, 554; Douglass v. Pike County, 101 U.S. 677, 687, 25 L.Ed. 968.

■■ It is contended that because of the withdrawal of the land as a naval reserve in 1912, and in consequence of the act of June 4, 1920, 41 Stat. 813, 34 U.S.C.A. § 524, giving the Secretary of the Navy control of the naval reserves, it was removed from the jurisdiction of the Interior Department. The holding in West v. Standard Oil Co., supra, is wholly inconsistent with this view, and we find no merit in the argument. See cases heretofore cited dealing with the general authority of the Department. Equally without merit is the contention that the Secretary was legally bound, under the circumstances of this case, to affirm the findings of the register. West v. Standard Oil Co., supra; Knight v. United Land Ass'n, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974; George W. Dally, 41 L.D. 295, 299.

3. Claimed Deductions.

Finally, the Standard contends that certain deductions claimed by it were improperly disallowed in making the award, and that there was error in awarding recovery for the cost of preparing some of the wells for a shutdown. Two of the items claimed to be deductible[9] represented the purchase price and acquisition costs paid by the Standard's predecessor for its interest in the land. The remaining item claimed to be deductible (amounting to $1,896,819.67) represents payments by the Standard to the Fairbank-Carman appellants as owners on account of oil and gas production.

■■ In respect of the damages recoverable the trial court properly viewed the case as one governed by the law of the state of California. Mason v. United States, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396. The court held, and the Standard agrees with it, that the applicable rule is found in § 349¾ of the Code of Civil Procedure of that state, the material parts of which follow:

"Measure of damages. In all cases where oil or gas has been heretofore or is hereafter extracted from any existing or

---

9 The total of these was $117,023.79.

subsequently drilled well in this state, by a person without right but asserting a claim of right in good faith or acting under an honest mistake of law or fact, the measure of damages, if there be any right of recovery under existing law, shall be the value of the oil or gas at the time of extraction, without interest, after deducting all costs of development, operation and production, which costs shall include taxes and interest on all expenditures from the date thereof."

■■■ The purchase price of the land was not paid to the United States or for its benefit, but to others who had no rights in the property. The royalties paid were not expenses of production and were not deductible under the decision in Mason v. United States, supra. And see Jeems Bayou F. & H. Club v. United States, 260 U. S. 561, 43 S.Ct. 205, 67 L.Ed. 402.

While recognizing the controlling force of these decisions, the Standard points out that its trespass was found to have been in good faith, and it contends that the Government is estopped from questioning the Company's right to credit for the payments. It points to the facts that the township had been reported as non-mineral in 1904; that the Register of the United States Land Office had certified to the state that there were no adverse claims against the section; that the discovery of oil was of distinct benefit to the Government; that the discovery work was done with the knowledge of the Department; that injunctive relief against the exploitation of the property, while available to the Government, was not sought, and that the Director of Naval Reserves felt that it would be disastrous to the interests of the navy if production from existing wells were stopped, since this would expose the section to drainage. On the latter point the record shows that the Department of Justice considered that the operators in possession were financially responsible and would be able to respond in damages if the operations were permitted to continue pending a speedy determination of the question of title. For these reasons, apparently, relief by way of injunction or receivership was not resorted to, the operators agreeing that they would refrain from further drilling.

■■■ It is elementary that to effect an estoppel there must be conduct upon which the party asserting it was induced to act. The Standard must show not only that it

was itself without knowledge of the true condition of the title, but that it had no convenient and available means of acquiring such knowledge. United States v. Lee Wilson & Co., D.C., 214 F. 630 affirmed 245 U.S. 24, 38 S.Ct. 21, 62 L.Ed. 128; Brant v. Va. Coal & Iron Co., 93 U.S. 326, 335, 23 L.Ed. 927; Oklahoma v. Texas, 268 U.S. 252, 256, 45 S.Ct. 497, 69 L.Ed. 937; Henshaw v. Bissel, 18 Wall. 255, 85 U.S. 255, 270, 21 L.Ed. 835. Beyond that, as said in United States v. Trinidad Coal & Coking Co., 137 U.S. 160, 170, 11 S.Ct. 57, 34 L.Ed. 640, the Government, in disposing of the public lands held in trust for all the people, is not to be classed with the ordinary purveyor of real estate.

■■■ We are not disposed to disturb the finding that the Standard acted in good faith. The record is persuasive that the trespass was the result of honest mistake of law or fact, or perhaps both. But the Standard was not so taken by surprise as to be in a position to claim estoppel. It was put on notice by a long series of events of public record tending to cast formidable doubt on the state's title. While the Government was to a marked degree dilatory, the delays were by no means all attributable to it. We think no sufficient case of laches or estoppel has been made out.

■■■ The court allowed recovery of $50,000 as the cost to the Government of preparing for a shutdown of the wells upon the rendition of the Secretary's decision. Appellants make no question that the expense was incurred, but deny that the cost is recoverable. The expense was a necessary one, was a direct consequence of the trespass, and no adequate reason is advanced in support of the view that the claim was improperly allowed.

#### Cross Appeal of the United States.

On its cross appeal the Government advances several contentions, the first of which is bottomed on the denial of a claimed right to recover interest on monthly balances. It is said that the court erred in applying § 349¾ of the California Code of Civil Procedure prescribing a measure of damage based on the net value of oil and gas extracted, without interest. It is claimed that the governing statute is § 3336 of the California Civil Code, which provides in part that the detriment caused by the wrongful conversion of personal property is presumed to be the value of the

property at the time of the conversion, with interest from that time.[10]

■ 1. The statute applied below was enacted in 1935, St.1935, p. 2285.[11] It is expressly made retroactive. It prescribes the measure of damages recoverable in all cases where oil or gas has been extracted by a person without right but acting in good faith or under an honest mistake of law or fact. The Government argues that the provision was intended to apply to cases of so-called "slant drilling" only, not to cases, such as this, involving a surface trespass. But the language employed admits of no such construction. Even if it were otherwise ambiguous, the legislative intent is made clear by the declaration of policy contained in section 2 of the bill to the effect that "public policy and welfare of the people require the measure of damages to be as above provided, in all cases where the invasion of the rights of another person has heretofore been or shall hereafter be by reason of any honest mistake of law or

fact, either by the departure of a well from the vertical or otherwise."

■ The act fixes a time limit of 180 days within which to bring suit on account of an underground trespass. From this limitation the state and its political subdivisions are excepted. By a strained process of reasoning the Government deduces that the word "limitations", as used in this proviso, has reference not only to time but to the rule of damages, and that the United States is impliedly excepted from the damages provision. However, the statute deals with two subjects only, the time limitation and the rule of damages. If the legislature had desired to except the state and its subdivisions from both, and not merely from the time limitation, it would doubtless have said so in plain terms by the simple method of providing that the act should not apply to suits by these bodies.

■■ The Government attacks the statute as contravening Art. I, sections 11 and 21

---

[10] This statute was amended in 1931 (Calif.Stats.1931, p. 1358). The Government argues that the statute, prior to amendment, is controlling.

[11] "349¾. Within one hundred eighty days: * * *

"(a) An action to enjoin, abate, or for damages on account of, an underground trespass, use or occupancy, by means of a well drilled for oil or gas or both from a surface location on land other than real property in which the aggrieved party has some right, title or interest or in respect to which the aggrieved party has some right, title or interest.

"(b) An action for conversion or for the taking or removing of oil, gas or other liquid, or fluids by means of any such well.

"When cause of action accrues. When any of said acts is by means of a new well the actual drilling of which is commenced after this section becomes effective, and such act was knowingly committed with actual intent to commit such act, the cause of action in such case shall not be deemed to have accrued until the discovery, by the aggrieved party, of the act or acts complained of; but in all other cases, and as to wells heretofore or hereafter drilled, the cause of action shall be deemed to have accrued ten days after the time when the well which is the subject of the cause of action was first placed on production.

"Only one cause of action. Notwithstanding the continuing character of any such act, there shall be but one cause

of action for any such act, and the cause of action shall accrue as aforesaid.

"Measure of damages. In all cases where oil or gas has been heretofore or is hereafter extracted from any existing or subsequently drilled well in this state, by a person without right but asserting a claim of right in good faith or acting under an honest mistake of law or fact, the measure of damages, if there be any right of recovery under existing law, shall be the value of the oil or gas at the time of extraction, without interest, after deducting all costs of development, operation and production, which costs shall include taxes and interest on all expenditures from the date thereof.

"Applicable to existing causes of action. This section shall apply to causes of action existing when this section becomes effective. The time for commencement of existing causes of action which would be barred by this section within the first one hundred eighty days after this section becomes effective, shall be the said first one hundred eighty days.

" 'Oil' and 'gas' defined. Whenever the term 'oil' is used in this section it shall be taken to include 'petroleum,' and the term 'gas' shall mean natural gas coming from the earth.

"Exceptions. The limitations prescribed by this section shall not apply to rights of action or actions to be brought in the name of or for the benefit of the people of this state, or of any county, city and county, city or other political subdivision of this state."

418

and Art. IV, section 25 of the state constitution,[12] and as violating the equal protection and due process clauses of the Fourteenth Amendment, U.S.C.A.Const.

The courts will not denounce a legislative classification unless it lacks a rational basis. "The determination of the legislature is presumed to be supported by facts known to it, unless facts judicially known or proved preclude that possibility." Clark v. Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 750, 83 L.Ed. 1001. The production of oil and gas has long been recognized as a proper subject for a special legislative treatment. See Ohio Oil Co. v. Indiana, No. 1, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Champlin Refining Co. v. Commission, 286 U.S. 210, 233, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; In re Lathrap, 9 Cir., 61 F. 2d 37, 40; People v. Associated Oil Co., 211 Cal. 93, 101, 294 P. 717; Bandini Petroleum Co. v. Superior Court, 110 Cal.App. 123, 293 P. 899, affirmed 284 U.S. 8, 52 S. Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826. Cf. Barnes v. Winona Oil Co., 83 Okl. 253, 200 P. 985, 987, 23 A.L.R. 189. Petroleum deposits, as is well known, are radically unlike static minerals because of their fugitive nature and the liability of an area to drainage without either surface or underground trespass. We cannot say that a statutory rule of damages, applying specially to the conversion of that species of property, providing a just measure of recovery in cases of good faith trespass, is so clearly arbitrary or unfair as to be a denial of equal protection merely because it denies interest.[13] Compare Lightner Mining Co. v. Lane, 161 Cal. 689, 120 P. 771, Ann.Cas.1913C, 1093.

It is contended that the damages provision of the statute, applied retrospectively, impairs a vested right to recover interest. The local rule of damages for conversion appears originally to have been stated in Douglass v. Kraft, 9 Cal. 562, in terms substantially identical with § 3336 of the Civil Code as later enacted in 1872. Cox v. McLaughlin, 76 Cal. 60, 18 P. 100, 9 Am.St. Rep. 164. In that same year a previous statute, passed in 1850, which adopted the

common law of England as the rule of decision in the courts of that state, was codified in § 4468 of the Political Code. The claim here is that, under the common law as announced in California, the right to recover interest in cases of trover and trespass de bonis asportatis was a substantive right, and that this vested right, as later embodied in § 3336 of the Civil Code, could not be taken away by retroactive legislation. With respect to § 3336, it is argued that the statute, as interpreted by the courts, announces a fixed rule of law allowing interest as a matter of right.

But in Tulley v. Tranor, 53 Cal. 274, the Supreme Court of the state held that § 3336 established a measure of damages operative only at the time of trial, and, further, that the statute is remedial, giving no vested right to the measure of damages provided by it. That case was in conversion, and it involved a retroactive amendment to the statute made after the action had been commenced. The decision was very lately cited and followed by the court of last resort of the state in Feckenscher v. Gamble, 12 Cal.2d 482, 85 P.2d 885. In Funkhouser v. Preston Co., 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243, it was held that a New York statute allowing the recovery of interest in actions for breach of contract concerns the remedy, and that the mere fact that the legislation is retroactive does not bring it into conflict with the guaranties of the Constitution. Compare Los Angeles v. Oliver, 102 Cal.App. 299, 283 P. 298.

The act does not deprive the injured party of interest on his judgment but merely precludes interest on items of damage which remain unliquidated until the time of trial. Counsel for the Government suggest that the legislation, or at least the insertion of the damage provision in the measure prior to its passage, was the result of sinister influence. Our concern, however, is with the finished product, not with problems of parentage. However mistaken may be its policy, the statute bears equally upon all persons engaged in the develop-

---

[12] These provide in substance that all laws of a general nature shall have a uniform operation; that no citizen, or class of citizens, shall be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens; and that the legislature shall not pass local or special laws in enumerated cases.

[13] While the statute provides for in-

terest on offsetting costs, no interest on its expenditures was claimed by the Standard or allowed it. Accordingly, we need not consider whether this feature of the statute denies equal protection. The act contains a separability clause declaring that the legislature would have enacted it irrespective of the fact that one or more of its provisos be declared unconstitutional.

ment of this great natural resource of the state. We are satisfied that the court properly construed and applied the local law and that the statute is not invalid on any of the grounds urged.

2. The cross appeal asserts error in the allowance of items of setoff aggregating $1,654,766.21. These are: (1) state and local taxes on the property paid by Standard, $574,351.22; (2) income taxes paid to the United States on the Standard's income from the property, $500,010.89; (3) overhead, $144,968.85; (4) costs of compressor and absorber plant, $381,748.88; and (5) preservation expenses after cessation of production, $53,686.37.

■■■ The item of taxes on the property is a deduction allowed by the express terms of the statute. It is doubtful whether income taxes normally fall in the same category, and it may be questioned whether they are to be classed generally as an expense of production. Doubts as to the proper construction of the statute in these regards need not be resolved. The amount of income taxes paid is not disputed, nor is it denied that the Standard was bound to make the payments regardless of the fact that the title was in dispute. On principle, the United States, having been paid this sum out of the proceeds of oil and gas converted through mistake, ought not to be permitted to recover it again, more especially since there was no possibility of the taxpayer's claiming a refund. The court cannot ignore the equities of the situation nor may it do violence to the spirit of the governing statute by exacting what amounts to a punitive recovery. Compare Stromberg Motor Devices Co. v. Detroit Trust Co., 7 Cir., 44 F.2d 958, and Stromberg Motor Devices Co. v. Zenith-Detroit Corp., 2 Cir., 73 F.2d 62.

■■■ On the subject of overhead the court found that the amount allowed is a proportion of the general office overhead of the Standard allocated to its operations on the disputed section in accordance with reasonable and accepted accounting practices. The finding is not assailed and it is supported by the evidence. The sum is clearly deductible as an expense of operation within the terms of the statute.

■■■ The same is true of the costs and expenses of the compressor and absorber plant. The wells produced not only oil, but wet gas, and the gas wells on the land produced dry gas. The latter is the gas used commercially for heat and power. Gasoline is extracted from wet gas, leaving a residue of dry gas. The plant in question was built for the purpose of separating the gasoline from the wet gas so that both resulting products would be rendered salable, and for the purpose of increasing the pressure of dry gas when the natural pressure became insufficient. Unless the plant had been built and operated part of the dry gas and all of the wet gas would have been lost. The Government was credited with the gross proceeds from this operation, and the Standard with the expenses of construction and operation. The item is well within the terms of the local statute.

■■■ The operation of the wells was discontinued in 1932 at the request of the Government. Because of this, the court found, relief by way of injunction or receivership became unnecessary. Expense of the voluntary maintenance of the property after shutdown, pending the outcome of court action, was a necessary one and the results were of important advantage to the Government. The trial court's allowance of this item of credit will not be disturbed.

Affirmed.

MATHEWS, Circuit Judge (dissenting).

The United States, plaintiff below, obtained a decree against defendants, Standard Oil Company of California, a corporation; Henry Fairbank, Charles Fairbank and Clara Fairbank Ranney, individually and as trustees of trusts created by the will of Charles O. Fairbank, deceased; Robert Fairbank, Claire Fairbank, Aileen Michael, Frank J. Carman, Elna Carman and others, quieting plaintiff's title to section 36, township 30 south, range 23 east, Mount Diablo Meridian, in Kern County, California, enjoining defendants from going upon or using said land or extracting oil or other minerals therefrom, and awarding damages to plaintiff against Standard Oil Company of California in the sum of $6,214,102.42. United States v. Standard Oil Company of California, D.C., 20 F.Supp. 427; Id., D.C., 21 F. Supp. 645. All the named defendants have appealed. Plaintiff, asserting that the damages awarded are inadequate, prosecutes a cross-appeal.

420

By § 6 of the Act of March 3, 1853,[1] c. 145, 10 Stat. 246, sections 16 and 36 in each township in the State of California were, with certain exceptions, granted to the State in aid of public schools. The pertinent exception was of lands known to be mineral at the date of approval of the survey thereof. Such lands were excluded from the grant. Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., 102 U.S. 167, 172–175, 26 L.Ed. 126; Mullan v. United States, 118 U.S. 271, 276, 6 S.Ct. 1041, 30 L.Ed. 170; West v. Standard Oil Co., 278 U.S. 200, 208, 49 S.Ct. 138, 73 L.Ed. 265.

The land here involved—section 36, township 30 south, range 23 east, Mount Diablo Meridian—was surveyed in 1901. The survey was approved on January 26, 1903. The State, in January, 1910, issued patents for the land, under which, by mesne conveyances, title is claimed by defendants.

On September 27, 1909, the Acting Secretary of the Interior ordered that, "In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land laws." The lists referred to embraced approximately 3,041,000 acres, including the land here involved.

On July 2, 1910, the President ordered that the Acting Secretary's order of September 27, 1909, be "ratified, confirmed and continued in full force and effect," and that, "subject to all of the provisions, limitations, exceptions, and conditions contained in the [Act of June 25, 1910,[2] c. 421, 36 Stat. 847, 43 U.S.C.A. §§ 141–143], there is hereby withdrawn from settlement, location, sale or entry, and reserved for classification and in aid of legislation affecting the use and disposal of petroleum lands belonging to the United States, all of those certain lands of the United States set forth and particularly described as follows. * * * " The description which followed embraced approximately 2,482,750 acres, including the land here involved.

On September 2, 1912, the President ordered "that all lands included in the following list and heretofore * * * withdrawn on July 2, 1910, from settlement, location, sale, or entry and reserved for classification and in aid of legislation under the authority of the [Act of June 25, 1910], shall hereafter, subject to valid existing rights, constitute Naval Petroleum Reserve No. 1 and shall be held for the exclusive use or benefit of the United States Navy until this order is revoked by the President or by act of Congress." The list referred to embraced approximately 38,069 acres, including the land here involved.

If, as claimed by defendants, title to the land here involved passed to the State on January 26, 1903, it was, of course, unaffected by the orders of September 27, 1909, July 2, 1910, and September 2, 1912. If, as claimed by plaintiff, title did not pass to the State, but remained in plaintiff, the land became, in consequence of said orders, a part of Naval Petroleum Reserve No. 1.

On January 14, 1914, a proceeding was commenced in the local land office at Visalia,[3] California, to determine whether the land was or was not known to be mineral on January 26, 1903. The State and those claiming under it—defendants and their predecessors in title—had notice[4] of the proceeding. Some of them appeared and participated therein. On June 9, 1921, the Secretary of the Interior (Albert B. Fall) ordered the proceeding dismissed. On May

[1] Section 6 provided: "That all the public lands in the State of California, whether surveyed or unsurveyed, with the exception of sections sixteen and thirty-six, which shall be and hereby are granted to the State for the purposes of public schools in each township, and with the exception of lands appropriated under the authority of this act, or reserved by competent authority, and excepting also the lands claimed under any foreign grant or title and the mineral lands, shall be subject to the preëmption laws of fourth September, eighteen hundred and forty-one, with all the exceptions, conditions, and limitations therein, except as is herein otherwise provided * * * ."

[2] Section 1 of the Act provides: "That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States * * * and reserve the same for waterpower sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals * * * ."

[3] The proceeding was subsequently transferred to the Sacramento land office.

[4] There was no notice until after March 2, 1921.

8, 1925, the then Secretary (Hubert Work) vacated Secretary Fall's order and directed the Register and Receiver to proceed.[5] State of California, etc., 51 L.D. 141.

In October, 1925, Standard Oil Company (predecessor in title of Standard Oil Company of California) brought a suit in the Supreme Court of the District of Columbia against Secretary Work to enjoin continuation of the land office proceeding, on the ground that, by Secretary Fall's order of dismissal, the question of the known mineral character of the land had been finally determined, and that the Department had no jurisdiction to redetermine it. The Supreme Court of the District so held, and entered a decree for a permanent injunction. That decree was affirmed by the Court of Appeals in Work v. Standard Oil Co., 57 App.D.C. 229, 23 F.2d 750, on December 5, 1927, but was reversed by the Supreme Court of the United States in West v. Standard Oil Co., supra, on January 2, 1929, the latter court holding that the question of the known mineral character of the land had not been determined, and that the Department had power to make such determination.

Accordingly, the Register heard evidence on the question and, on February 24, 1932, rendered his decision, holding that the land was not known to be mineral on January 26, 1903. The Register's decision was affirmed by the Commissioner of the General Land Office on February 23, 1933. On January 24, 1935, the Secretary of the Interior (Harold L. Ickes) reversed the Commissioner's decision and held that the land was known to be mineral on January 26, 1903. United States v. State of California, 55 L.D. 121. A motion for rehearing was denied on May 20, 1936. 55 L.D. 532. This suit was commenced on January 20, 1937.

The bill alleges, and the answers deny, that the land was known to be mineral on January 26, 1903. The issue thus presented was not tried or determined by the court below. Instead, the court reviewed the record of the land office proceeding; found that there was sufficient evidence in the record to sustain Secretary Ickes' decision; held that his decision was binding on defendants and conclusive on the courts; and,

therefore, refused to try the issue de novo. United States v. Standard Oil Company of California, D.C., 20 F.Supp. 427, 437-446; Id., D.C., 21 F.Supp. 645, 649-653. The refusal is assigned as error.

As stated in West v. Standard Oil Co., supra: "If the land was [on January 26, 1903] known to be mineral, the title confessedly did not pass by the act * * *. If it was not then known to be mineral, the legal title passed to the state on that date." 278 U.S. 208, 49 S.Ct. 139, 73 L.Ed. 265. See, also, United States v. Morrison, 240 U.S. 192, 197-210, 36 S.Ct. 326, 60 L.Ed. 599. Such passing of title did not await, or depend on, any subsequent action of the Land Department. No such action was contemplated or provided for. As stated in the West case, the granting Act "does not provide for the issue of patents or for any equivalent action by the Department to evidence the transfer of title to the state." 278 U.S. 208, 49 S.Ct. 140, 73 L.Ed. 265. Thus, it is clear, the legal title passed to the State, if at all, on January 26, 1903; and whether it did or did not so pass depends on whether the land was or was not then known to be mineral. Secretary Ickes had power to determine that question (278 U.S. pages 207-221, 49 S.Ct. 138, 73 L.Ed. 265), and did determine it on January 24, 1935. The question here is whether or not his determination is binding on defendants and conclusive on the courts.

In the West case, the Supreme Court said: "We assume, without deciding, that, if Secretary Fall had determined as a fact that the land was not known to be mineral on January 26, 1903, his order dismissing the proceedings would have ended the jurisdiction of the Department over the land. And this determination would ordinarily be conclusive on the courts, even if there were demonstrable error in the admission, or appreciation of evidence. * * * But we are of the opinion that Secretary Fall did not make a determination of that fact." 278 U.S. 213, 49 S.Ct. 141, 73 L.Ed. 265.

So, in this case, it may be assumed that if Secretary Ickes had determined as a fact that the land was *not* known to be mineral on January 26, 1903, thus, in effect, determining that the legal title had passed from

---

[5] Secretary Work's order mentioned, and apparently was prompted by, a joint resolution of Congress, approved February 21, 1924, c. 39, 43 Stat. 15, "That the Secretary of the Interior be, and he hereby is, directed forthwith to institute proceedings to assert and establish the title of the United States to sections 16 and 36, township 30 south, range 23 east, Mount Diablo meridian, within the exterior limits of naval reserve numbered 1 in the State of California * * *."

plaintiff, such determination would have been binding on plaintiff and conclusive on the courts. But Secretary Ickes did not so determine. On the contrary, he determined that the land *was* known to be mineral on January 26, 1903, thus, in effect, determining that the legal title had not passed from plaintiff.

The Supreme Court did not assume, much less decide, that if Secretary Fall had determined that the land was known to be mineral on January 26, 1903, thus, in effect, determining that the legal title had not passed from plaintiff, such determination would have been binding on the State or its transferees (defendants here), or conclusive on the courts. Nor may we make any such assumption in this case. To assume that the act of an agent (the Secretary of the Interior) with respect to certain property would be binding on his principal (the United States), is one thing. To assume that the agent's act would be binding on parties (the State and its transferees) claiming adversely to the principal, is quite another thing. It should here be observed that the Secretary, in making the determination referred to, was acting as plaintiff's agent merely, and not as a special tribunal with judicial functions. This appears from the West case, where the Supreme Court said:

"Where, by the terms of an act, the Secretary is required, upon application of the claimant, to issue a patent, as in Michigan Land & Lumber Co. v. Rust, 168 U.S. 589, 592, 18 S.Ct. 208 (42 L.Ed. 591), or to certify a list, as in Frasher v. O'Connor, 115 U.S. 102, 115, 116, 5 S.Ct. 1141 (29 L.Ed. 311), or to approve a location for a right of way, as in Noble v. Union River Logging R. R. Co., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123, or to make a survey and approve a selection, as in Shaw v. Kellogg, 170 U.S. 312, 18 S.Ct. 632, 42 L.Ed. 1050, Congress, by implication, confers upon the Secretary the power to make all determinations of law as well as of fact which are essential to the performance of the duty specifically imposed. After issue of the patent or other like instrument, his findings of facts are conclusive, in the absence of fraud or mistake, not only upon the Department, but upon the courts, De Cambra v. Rogers, 189 U.S. 119, 23 S.Ct. 519, 47 L.Ed. 734; Love v. Flahive, 205 U.S. 195, 198, 27 S.Ct. 486 (51 L.Ed. 768); and, though his rulings on matters of law are reviewable in the courts, Doolan v. Carr, 125 U.S. 618, 625, 8 S.Ct. 1228 (31 L.Ed. 844); Wisconsin Central R. Co. v. Forsythe, 159 U.S. 46, 61, 15 S. Ct. 1020, (40 L.Ed. 71), they are not subject to re-examination by the Department. Johnson v. Towsley, 13 Wall. 72, 83, 84 (20 L.Ed. 485). For in making such determinations he acts as a special tribunal with judicial functions. Riverside Oil Co. v. Hitchcock, 190 U.S. 316, 324, 23 S.Ct. 698 (47 L.Ed. 1074).

"But here no similar affirmative duty rested upon the Secretary to the performance of which the determination of the question of law was incidental. Secretary Fall owed no active duty to the state or to any other claimant. His duty in respect to the land was solely that owed to the United States—the duty to preserve its interests therein. The inquiry directed to be made in the local land office had been ordered by a predecessor solely in the performance of that duty. * * *" 278 U.S. 218, 219, 49 S.Ct. 143, 73 L.Ed. 265.

The "inquiry" referred to—the land office proceeding commenced on January 14, 1914, and purportedly dismissed by Secretary Fall on June 9, 1921—continued under Secretary Fall's successors, including Secretary Ickes, and culminated in Secretary Ickes' decision of January 24, 1935. Secretary Ickes' duty in the premises was, of course, the same as Secretary Fall's had been. He, like Secretary Fall, "owed no active duty to the State" or its transferees. His duty in respect to the land was, as Secretary Fall's had been, "solely that owed to the United States—the duty of protecting its interests therein." When, therefore, as a result of the inquiry, Secretary Ickes determined that the land was known to be mineral on January 26, 1903, he was acting as plaintiff's agent merely, and not as a special tribunal with judicial functions.

Even though he had been acting as a special tribunal with judicial functions, the Secretary's determination would not have had the conclusive effect attributed to it by the court below. The determination was made on January 24, 1935. Defendants claim that legal title to the land passed from plaintiff on January 26, 1903. This claim does not merely challenge the correctness of the Secretary's determination. It reaches beyond that and goes to the existence of a subject on which the Secretary was competent to act. Thus, the fact determined by the Secretary—that the legal title had not passed from plaintiff—was a jurisdictional fact. Hence, the determination is not binding on defendants or conclusive on the

courts. Iron Silver Mining Co. v. Campbell, 135 U.S. 286, 290–296, 10 S.Ct. 765, 34 L.Ed. 155; Davis v. Weibbold, 139 U.S. 507, 527–530, 11 S.Ct. 628, 35 L.Ed. 238; Hardin v. Jordan, 140 U.S. 371, 400, 401, 11 S.Ct. 808, 838, 35 L.Ed. 428; Borax Consolidated, Ltd. v. Los Angeles, 296 U.S. 10, 16–19, 56 S.Ct. 23, 80 L.Ed. 9. See, also, Crowell v. Benson, 285 U.S. 22, 54–63, 52 S.Ct. 285, 76 L.Ed. 598.

In Iron Silver Mining Co. v. Campbell, supra, a placer patent had been issued to Moyer, under whom the Mining Company claimed title to a vein or lode which existed in the patented land. By the terms of the patent and of the statute under which it was issued, any vein or lode existing and known to Moyer at the time he applied for patent was excluded therefrom. Subsequently, the Land Department determined as a fact that the existence of the vein or lode was known to Moyer at the time he applied for patent, thus, in effect, determining that legal title to the vein or lode had not passed from the United States. Thereafter, a lode patent for the vein or lode was issued to Campbell's predecessor in title. In an action of ejectment by Campbell against the Mining Company, Campbell contended that the Land Department's determination was conclusive. Rejecting this contention, the Supreme Court said:

" * * * If it be said that the question of the reservation of this vein as a known lode under the law on that subject makes a difference in this respect, and that the land-office has a right to inquire whether such lode existed, and whether its existence was known to the patentee of the first patent, we answer that a patent issued under such circumstances to the claimant of the lode claim may possibly be such prima facie evidence of the facts named as will place the parties in a condition to contest the question in a court.

"But we are of opinion that it is always and ultimately a question of judicial cognizance. The first patent conferred upon Moyer the right to this vein, and to all other veins within the limits of his 50 acres of placer claim. There is excepted from that grant any lode existing and known at the time application was made for his patent. Whether such a lode did exist, and whether it was known to him, is a question which he has a right to have tried by a court of justice, and from which he cannot be excluded by the subsequent action of the officers of the land department. * * *" 135 U.S. 293, 10 S.Ct. 767, 34 L.Ed. 155.

In Davis v. Weibbold, supra, the United States had issued a townsite patent, under which Davis claimed title. By the terms of the patent and of the statute under which it was issued, lands known to be mineral at the date of the patent were excluded therefrom. Subsequently, the Land Department determined as a fact that the land claimed by Davis was known to be mineral when the townsite patent issued, thus, in effect, determining that legal title to the land had not passed from the United States. Thereafter, a patent was issued to Weibbold. In an action by Weibbold against Davis for possession of the land, Weibbold contended that the Land Department's determination was conclusive. Rejecting this contention, the Supreme Court said:

"We agree to all that is urged by counsel as to the conclusiveness of the patents of the land department when assailed collaterally in actions at law. We have had occasion to assert their unassailability in such cases in the strongest terms * * *. They are conclusive in such actions of all matters of fact necessary to their issue, where the department had jurisdiction to act upon such matters, and to determine them; but if the lands patented were not at the time public property, having been previously disposed of, or no provision had been made for their sale or other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the land, and their attempted conveyance by patent is inoperative and void, no matter with what seeming regularity the forms of law have been observed." 139 U.S. 529, 530, 11 S.Ct. 636, 35 L.Ed. 238.

In Hardin v. Jordan, supra, Hardin claimed title under a patent issued in 1841 for lands bounded by Wolf Lake, in Illinois. The question was whether the lands so patented included the land under the lake. In 1874, in a proceeding in which Hardin participated, the Secretary of the Interior determined that the land under the lake was not included in the grant of 1841, and that legal title thereto had not passed from the United States. Thereafter, the land under the lake was surveyed and patented to Jordan's predecessors in title. In an action of ejectment by Hardin against Jordan, Jordan contended that the Secretary's determination was conclusive. Rejecting this contention, the Supreme Court said:.

"\* \* \* It is very true that the decisions of the land department on matters of fact within its jurisdiction, made in due course of administration, cannot be called in question collaterally. But, as was declared in the recent case of Davis v. Weibbold, [139 U.S. 507, 11 S.Ct. 628, 35 L.Ed. 238], decided at the present term of this court, 'if the lands patented were not at the time public property, *having been previously disposed of,* or no provision had been made for their sale or other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the lands, and their attempted conveyance by patent is inoperative and void.' So that, if the lands had been 'previously disposed of,' the department has no jurisdiction over them; and the question whether they have or have not been previously disposed of is a judicial question, and not determinable by the executive department, except for the purpose of governing its own conduct in the administration of its functions." 140 U.S. 400, 401, 11 S.Ct. 818, 35 L.Ed. 428.

In Borax Consolidated, Ltd. v. Los Angeles, supra, the City of Los Angeles claimed title, by legislative grant from the State of California, to land which the City claimed was tideland. If the land was tideland, legal title thereto passed from the United States to the State on its admission to the Union in 1850. If it was not tideland, the legal title remained in the United States. In 1880 the Land Department determined as a fact that the land was not tideland, but upland, thus in effect, determining that the legal title had not passed from the United States. Accordingly, the land was surveyed, and a patent therefor was issued to Banning, predecessor in title of Borax Consolidated. In a suit by the City to quiet its title, Borax Consolidated and other defendants (referred to in the opinion as petitioners) contended that the Land Department's determination was conclusive. Rejecting this contention, the Supreme Court said:

"\* \* \* Petitioners thus invoke the rule that 'the power to make and correct surveys belongs to the political department of the government and that, whilst the lands are subject to the supervision of the General Land Office, the decisions of that bureau in all such cases, like that of other special tribunals upon matters within their exclusive jurisdiction, are unassailable by the courts, except by a direct proceeding.' [6] \* \* \*

"But this rule proceeds upon the assumption that the matter determined is within the jurisdiction of the Land Department. \* \* \* So far as pertinent here, the jurisdiction of the Land Department extended only to 'the public lands of the United States.' \* \* \* Specifically, the term 'public lands' did not include tidelands. \* \*

"The question before us is not as to the general authority of the Land Department to make surveys, but as to its authority to make a survey, as a basis for a patent, which would preclude the state or its grantee from showing in an appropriate judicial proceeding that the survey was inaccurate and hence that the patent embraced land which the United States had no power to convey. Petitioners' argument in substance is that while the United States was powerless as against the state to pass title to tidelands in the absence of a survey \* \* \*, the question whether or not the land was tideland would be foreclosed by a departmental survey although erroneous. This contention encounters the principle that the question of jurisdiction, that is, of the competency of the Department to act upon the subject-matter, is always one for judicial determination. \* \* \* Here, the question goes to the existence of the subject upon which the Land Department was competent to act. Was it upland, which the United States could patent, or tideland, which it could not? Such a controversy as to title is appropriately one for judicial decision upon evidence, and we find no ground for the conclusion that it has been committed to the determination of administrative officers." 296 U.S. 16-19, 56 S.Ct. 26, 80 L.Ed. 9.

In Crowell v. Benson, supra, 285 U.S. pages 54-63, 52 S.Ct. 285, 76 L.Ed. 598, the court had under consideration the question of the conclusiveness of findings made by a deputy commissioner of the United States Employees' Compensation Commission in a proceeding under the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U.S.C.A. §§ 901-950. Among the facts found, were some[7] which the court regarded as "fundamental or 'jurisdictional,'[8] in the sense that

---

[6] Cragin v. Powell, 128 U.S. 691, 698, 9 S.Ct. 203, 32 L.Ed. 566.

[7] That the injury occurred upon navigable waters of the United States, and

that the relation of master and servant existed.

[8] In a footnote, the court said: "The term 'jurisdictional,' although frequently

their existence is a condition precedent to the operation of the statutory scheme." 285 U.S. page 54, 52 S.Ct. 294, 76 L.Ed. 598. These jurisdictional findings, the court held, were not conclusive. In considering the question of their conclusiveness, the court noted the inappositeness of "decisions with respect to determinations of fact, upon evidence and within the authority conferred, made by administrative agencies which have been created to aid in the performance of governmental functions, and where the mode of determination is within the control of the Congress; as, e. g., in the proceedings of the Land Office pursuant to provisions for the disposition of public lands." 285 U.S. page 57, 52 S.Ct. 295, 76 L.Ed. 598. The court observed that "None of the decisions of this sort touch the question which is presented where the facts involved are jurisdictional." 285 U.S. page 58, 52 S.Ct. 295, 76 L.Ed. 598. Continuing, the court said:

"Even where the subject lies within the general authority of the Congress, the propriety of a challenge by judicial proceedings of the determinations of fact deemed to be jurisdictional, as underlying the authority of executive officers, has been recognized. * * * While, in the administration of the public land system, questions of fact are for the consideration and judgment of the Land Department and its decision of such questions is conclusive, it is equally true that, if lands 'never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them.' This Court has held that 'matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act.' Smelting Co. v. Kemp, 104 U.S. 636, 641, 26 L.Ed. 875. In such a case, the invalidity of the patent may be shown in a collateral proceeding.

* * *" 285 U.S. 58, 59, 52 S.Ct. 295, 76 L.Ed. 598.

The doctrine deduced from the foregoing decisions is that the Land Department's jurisdiction over public land of the United States ends when the legal title to such land passes from the United States; that, therefore, the question whether the legal title to such land has or has not so passed is a jurisdictional question; and that, when such a question arises, the Land Department has power to determine it "for the purpose of governing its own conduct in the administration of its functions;"[9] but that, if the Department determines the question in favor of the United States— that is to say, determines that the legal title has not passed from the United States[10]—such determination is not binding on the party against whom it is made nor conclusive on the courts.

Many cases are cited in plaintiff's brief, but none of them supports the contention that the determination which Secretary Ickes made on January 24, 1935—that the land here involved was known to be mineral on January 26, 1903, and that, therefore, legal title had not passed from plaintiff—is binding on defendants and conclusive on the courts.

Some of the cases cited by plaintiff refute that contention. For example, in St. Louis Smelting & Refining Co. v. Kemp, 104 U.S. 636, 26 L.Ed. 875, cited by plaintiff, a patent had been issued to the Smelting Company's predecessor in title. In issuing the patent, the Land Department had determined certain facts. The Supreme Court held that the determination was conclusive. Why? Because, as the court was careful to point out, there was, in that case, no question of jurisdiction. The determination was made at a time when, admittedly, legal title to the land involved was in the United States. It was not claimed or suggested that the land had previously been disposed of. The court said:

"Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a

---

used, suggests analogies which are not complete when the reference is to administrative officials or bodies. See Interstate Commerce Commission v. Humboldt Steamship Co., 224 U.S. 474, 484, 32 S.Ct. 556, 56 L.Ed. 849. In relation to administrative agencies, the question in a given case is whether it falls within the scope of the authority validly conferred." 285 U.S. 54, 52 S.Ct. 294, 76 L.Ed. 598.

[9] Hardin v. Jordan, supra, 140 U.S. page 401, 11 S.Ct. 819, 35 L.Ed. 428.

[10] As Secretary Ickes did in this case when he determined that the land involved was known to be mineral on January 26, 1903.

case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would, in that event, be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act." 104 U.S. 641, 26 L.Ed. 875.

In Noble v. Union River Logging R. Co., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123, cited by plaintiff, the Railroad Company had been granted a right of way over public land, such grant being evidenced by the approval, by the Secretary of the Interior, of the Company's maps of definite location. In giving such approval, the Secretary had determined certain facts, such determination being made at a time when, admittedly, legal title to the land involved was in the United States. The determination was held conclusive because—and solely because—the facts determined were not jurisdictional, but were, at most, merely quasi jurisdictional. The court said:

"It is true that, in every proceeding of a judicial nature, there are one or more facts which are strictly jurisdictional, the existence of which is necessary to the validity of the proceedings, and without which the act of the court is a mere nullity. * * *

"There is, however, another class of facts which are termed 'quasi jurisdictional,' which are necessary to be alleged and proved in order to set the machinery of the law in motion, but which, when properly alleged, and established to the satisfaction of the court, cannot be attacked collaterally. With respect to these facts, the finding of the court is as conclusively presumed to be correct as its finding with respect to any other matter in issue between the parties. * * *

"This distinction has been taken in a large number of cases in this court, in which the validity of land patents has been attacked collaterally, and it has always been held that the existence of lands subject to be patented was the only necessary prerequisite to a valid patent. In the one class of cases it is held that, if the land attempted to be patented had been reserved, or was at the time no part of the public domain, the land department had no jurisdiction over it, and no power or authority to dispose of it. In such cases its action in certifying the lands under a railroad grant, or in issuing a patent, is not merely irregular, but absolutely void, and may be shown to be so in any collateral proceeding. * * *

"Upon the other hand, if the patent be for lands which the land department had authority to convey, but it was imposed upon, or was induced by false representations to issue a patent, the finding of the department upon such facts cannot be collaterally impeached, and the patent can only be avoided by proceedings taken for that purpose. * * *" 147 U.S. 173-175, 13 S.Ct. 273, 37 L.Ed. 123.

Determinations by the Land Department were held conclusive in French v. Fyan, 93 U.S. 169, 23 L.Ed. 812; United States v. Schurz, 102 U.S. 378, 26 L.Ed. 167; Steel v. St. Louis Smelting & Refining Co., 106 U.S. 447, 1 S.Ct. 389, 27 L.Ed. 226; Lee v. Johnson, 116 U.S. 48, 6 S.Ct. 249, 29 L.Ed. 570; Heath v. Wallace, 138 U.S. 573, 11 S.Ct. 380, 34 L.Ed. 1063; Barden v. Northern Pacific R. Co., 154 U.S. 288, 14 S.Ct. 1030, 38 L.Ed. 992; Orchard v. Alexander, 157 U.S. 372, 15 S. Ct. 635, 39 L.Ed. 737; Catholic Bishop of Nesqually v. Gibbon, 158 U.S. 155, 15 S. Ct. 779, 39 L.Ed. 931; McCormick v. Hayes, 159 U.S. 332, 16 S.Ct. 37, 40 L.Ed. 171; Parsons v. Venzke, 164 U.S. 89, 17 S.Ct. 27, 41 L.Ed. 360; Michigan Land & Lumber Co. v. Rust, 168 U.S. 589, 18 S.Ct. 208, 42 L.Ed. 591; Johnson v. Drew, 171 U.S. 93, 18 S.Ct. 800, 43 L.Ed. 88; Guaranty Savings Bank v. Bladow, 176 U.S. 448, 20 S.Ct. 425, 44 L.Ed. 540; Hawley v. Diller, 178 U.S. 476, 20 S.Ct. 986, 44 L.Ed. 1157; United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U.S. 316, 23 S.Ct. 698, 47 L.Ed. 1074; United States v. Chicago, Milwaukee & St. Paul Ry. Co., 218 U.S. 233, 31 S.Ct. 7, 54 L.Ed. 1015; Weyerhaeuser v. Hoyt, 219 U.S. 380, 31

S.Ct. 300, 55 L.Ed. 258; Burke v. Southern Pacific R. Co., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed 1527; Northern Pacific R. Co. v. McComas, 250 U.S. 387, 39 S.Ct. 546, 63 L.Ed. 1049; and Cameron v. United States, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659, cited by plaintiff, but, in each of those cases, the determination was made at a time when, admittedly, legal title to the land involved was in the United States. Therefore, the facts determined were not jurisdictional.

French v. Fyan; Heath v. Wallace; McCormick v. Hayes; Michigan Land & Lumber Co. v. Rust; United States v. Chicago, Milwaukee & St. Paul Ry. Co.; and Northern Pacific R. Co. v. McComas, supra, involved swamp lands granted, or claimed to have been granted, by the Act of September 28, 1850, c. 84, 9 Stat. 519, 43 U.S.C.A. § 982 et seq. Plaintiff apparently assumes that swamp lands granted by the Act of 1850 and school lands granted by the Act of 1853, here involved, are in the same category. The assumption is erroneous. Whereas, as heretofore shown, legal title to school lands passed from the United States, if at all, upon the approval of the survey thereof, and without the issuance of patent, legal title to swamp lands did not so pass, but remained in the United States until patent issued. Until then, generally speaking, such lands remained under the jurisdiction of the Land Department, and the duty of identifying them devolved on that Department. See, in addition to cases cited above, Brown v. Hitchcock, 173 U.S. 473, 476, 19 S.Ct. 485, 43 L.Fd. 772; Oregon v. Hitchcock, 202 U.S. 60, 70, 26 S.Ct. 568, 50 L.Ed. 935; Work v. Louisiana, 269 U.S. 250, 255, 46 S.Ct. 92, 70 L.Ed. 259.

However, with respect to swamp lands in California, the general rule was modified by the Act of July 23, 1866, c. 219, 14 Stat. 218, entitled "An Act to quiet Land Titles in California."[11] When, pursuant to this Act, the State's segregation maps and surveys identifying lands claimed by it as swamp lands were found by the Commissioner of the General Land Office to conform to the system of surveys adopted by the United States, such lands were thereby removed from the jurisdiction of the Land Department, so that, thereafter, the Department could make no conclusive determination concerning them, even though, at the time of making such determination, no certificate or patent had been issued.

Thus, in Wright v. Roseberry, 121 U.S. 488, 7 S.Ct. 985, 30 L.Ed. 1039, the State's maps and surveys were found by the Commissioner to conform to the system of surveys adopted by the United States, but the Land Department, instead of certifying the land to the State, issued patents therefor to other claimants, thus, in effect, determining that the land was not swamp land. The court held that the determination was not conclusive or binding on a transferee of the State, because, said the court:

"The doctrine that all presumptions are to be indulged in support of proceedings upon which a patent is issued, and which is not open to collateral attack in an action of ejectment, has no application where it is shown that the land in controversy had, before the initiation of the proceedings upon which the patent was issued, passed from the United States. The previous transfer is a fact which may be established in an action at law as well as in a suit in equity." 121 U.S. 519, 7 S.Ct. 999, 30 L.Ed. 1039.

Wright v. Roseberry, supra, was followed and reaffirmed in Irwin v. San Francisco Savings Union, 136 U.S. 578, 10 S.Ct. 1064, 34 L.Ed. 540, and Tubbs v. Wilhoit, 138 U.S. 134, 11 S.Ct. 279, 34 L. Ed. 887.

In Burfenning v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co., 163 U.S.

---

11 Section 4 of the Act provided: "That in all cases where township surveys have been, or shall hereafter be, made under authority of the United States, and the plats thereof approved, it shall be the duty of the commissioner of the general land office to certify over to the State of California, as swamp and overflowed, all the lands represented as such, upon such approved plats, within one year from the passage of this act, or within one year from the return and approval of such township plats. The commissioner shall direct the United States surveyor-general for the State of California to examine the segregation maps and surveys of the swamp and overflowed lands made by said State; and where he shall find them to conform to the system of surveys adopted by the United States, he shall construct and approve township plats accordingly, and forward to the general land office for approval * * *." 14 Stat. 219.

321, 16 S.Ct. 1018, 41 L.Ed. 175, cited by plaintiff, the question was whether the land involved had or had not been reserved from homestead and preemption. · The Land Department determined that it had not been reserved and, accordingly, issued a patent therefor to Burfenning's predecessor in title. In an action by Burfenning against the Railway Company for possession of the land, Burfenning contended that the Department's determination was conclusive. Rejecting this contention, the Supreme Court held that the land had been reserved, that the Department had no jurisdiction to issue the patent, and that the patent was void.

In Rogers Locomotive Machine Works v. American Emigrant Co., 164 U.S. 559, 17 S.Ct. 188, 41 L.Ed. 552, cited by plaintiff, the land involved had been granted to the State of Iowa, either by the Act of September 28, 1850, supra, or by the Act of May 15, 1856, c. 28, 11 Stat. 9. If it was swamp land, it was within the grant of 1850. If not, it was within the grant of 1856. The Secretary of the Interior determined that it was swamp land. Subsequently, he determined that it was not. The State acquiesced in the latter determination and accepted the land as being within the grant of 1856. It was held that the State's action was binding on a county of the State, to which the State had, in 1853, made a legislative grant of swamp lands within the county. Thus, the county and those claiming under it were concluded, not by the Secretary's determination, but by the State's action.

So, in Little v. Williams, 231 U.S. 335, 34 S.Ct. 68, 58 L.Ed. 256, cited by plaintiff, levee districts which were mere political subdivisions of the State of Arkansas were held bound by that State's action in relinquishing to the United States land to which the State had, or may have had, an inchoate title under the Act of September 28, 1850. There has been no equivalent State action in this case.

Another case cited by plaintiff is Knight v. United States Land Ass'n, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974, of which it suffices to say what the Supreme Court said, speaking of the same case, in Borax Consolidated, Ltd. v. Los Angeles, supra: "But that decision is not in point, as it related to land which, albeit tideland, had been the subject of a Mexican grant made prior to statehood. What had there been done by the federal government was found to be in pursuance of the duty of the United States, imposed by the treaty of Guadalupe Hidalgo and the principles of international law, to protect the rights of property which had previously been created by the Mexican government." 296 U.S. 19, 56 S.Ct. 28, 80 L.Ed. 9.

No question as to the conclusiveness of any determination by the Land Department was involved or decided in Heydenfeldt v. Daney Gold & Silver Mining Co., 93 U.S. 634, 23 L.Ed. 995; Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., supra; Mullan v. United States, supra; Wisconsin Central R. R. Co. v. Price County, 133 U.S. 496, 10 S.Ct. 341, 33 L.Ed. 687; Brown v. Hitchcock, supra; Johanson v. Washington, 190 U.S. 179, 23 S.Ct. 825, 47 L.Ed. 1008; Cosmos Exploration Co. v. Gray Eagle Oil Co., 190 U.S. 301, 23 S.Ct. 692, 47 L.Ed. 1064; Humbird v. Avery, 195 U.S. 480, 25 S.Ct. 123, 49 L.Ed. 286; Oregon v. Hitchcock, supra; United States v. Morrison, supra; United States v. Sweet, 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473; Work v. Louisiana, supra, cited by plaintiff.

Such a question might have been, but was not, raised in Ivanhoe Mining Co. v. Keystone Consolidated Mining Co., supra. That was an action by the Ivanhoe Company, a transferee of the State of California, against the Keystone Company, a patentee of the United States, for possession of part of a school section which the Ivanhoe Company claimed had been granted to the State by the Act of March 3, 1853. The Keystone Company defended on the ground that the land was known to be mineral at the date of the approval of the survey thereof. The Keystone Company's patent was for a mining claim located after that date. In issuing such a patent, the Land Department had, in effect, determined the question of the known mineral character of the land adversely to the Ivanhoe Company and in favor of the Keystone Company; but that determination was not relied on by the Keystone Company or considered by the court. Instead, the court heard evidence on the question and, on the evidence, made its own determination.

The same course was followed in United States v. Sweet, supra. That was a suit by the United States against Sweet, a transferee of the State of Utah, to quiet the title to a school section which Sweet

claimed had been granted to the State by the Act of July 16, 1894, c. 138, 28 Stat. 107. Whether the section was or was not within the grant depended on whether it was or was not known to be mineral at the date of the approval of the survey thereof. Though not mentioned in the opinion, it may be assumed that, before the suit was commenced, the Land Department had determined the question of the known mineral character of the land adversely to Sweet and in favor of the United States. Otherwise, there would have been no suit. In the suit, however, the United States did not rely on, nor did the court consider, any determination by the Land Department. Instead, the court heard evidence on the question and, on the evidence, made its own determination. That course should have been followed in this case.

As the court below fell into a fundamental error in treating Secretary Ickes' decision as conclusive, it is not incumbent on us to review the evidence in the record now before us, or to decide whether it shows or fails to show that the land involved was known to be mineral on January 26, 1903. Compare Borax Consolidated, Ltd. v. Los Angeles, supra, 296 U. S. page 21, 56 S.Ct. 23, 80 L.Ed. 9.

The decree should be reversed, and the case should be remanded for a new trial.